No. 23-3694

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

―――――――――――

CITY OF HUNTINGTON BEACH, et al.,
*Plaintiffs and Appellants,*

v.

GAVIN NEWSOM, et al.,
*Defendants and Appellees,*

―――――――――――

On Appeal from the United States District Court for
the Central District of California
Case No. 8:23-CV-00421-FWS-ADSx
Honorable Fred W. Slaughter

―――――――――――

## ANSWERING BRIEF OF APPELLEES GAVIN NEWSOM, CALIFORNIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT, AND GUSTAVO VELASQUEZ

―――――――――――

Thomas P. Kinzinger, Deputy Attorney General (SBN 323889)
Matthew T. Struhar, Deputy Attorney General (SBN 293973)
300 S. Spring Street, Ste. 1702
Los Angeles, CA 90013
Tel: (213) 269-6230 Fax: (916) 731-2121
Email: Thomas.Kinzinger@doj.ca.gov
Matthew.Struhar@doj.ca.gov

*Attorneys for Defendants and Appellees Gavin Newsom,
the California Department of Housing and Community
Development, and Gustavo Velasquez*

1

### DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants and Appellees Gavin Newsom, Gustavo Velasquez, and the California Department of Housing and Community Development state that none of these appellees is a nongovernmental corporation.

April 3, 2024

THOMAS P. KINZINGER, DEPUTY ATTORNEY GENERAL

By:    /s/ Thomas P. Kinzinger
      Thomas P. Kinzinger
*Attorneys for Defendants and Appellees Gavin Newsom, the California Department of Housing and Community Development, and Gustavo Velasquez*

2

# TABLE OF CONTENTS

**Page**

Introduction ................................................................. 14

Statement of Jurisdiction .............................................. 16

Issue Presented ............................................................ 16

Statement of the Case .................................................. 17

    I.    Statement of Facts ............................................. 17

        A.   The Housing Element Law ......................... 17

        B.   Huntington Beach's RHNA Was Developed and Decided Through a Neutral Process, with Full Participation by the City ............................... 18

        C.   Huntington Beach Fails to Revise Its Housing Element in Accordance with State Law ........................ 20

    II.   Statement of Procedure ..................................... 22

        A.   Plaintiffs' Complaint ................................. 22

        B.   Defendants' Motions to Dismiss ................. 23

        C.   Plaintiffs' Opposition and Defendants' Replies .......... 24

        D.   The District Court's Minute Order .............. 26

        E.   Appellants' Emergency Motion ................... 26

Standard of Review ...................................................... 27

Summary of the Argument ............................................ 28

Argument .................................................................... 29

    I.    The City Does Not Have Standing ......................... 29

        A.   The Federal Constitution Does Not Protect Political Subdivisions of States .................... 30

        B.   The State Appellate Cases the City Cites are Inapposite and Irrelevant ........................... 34

    II.   The Elected City Officials Do Not Have Standing ................. 39

**TABLE OF CONTENTS**
**(continued)**

Page

III.    The District Court Correctly Declined to Grant Leave to Amend .................................................................. 43

IV.    In The Alternative, Younger Abstention is Proper ................. 44

V.    In the Alternative, This Action Could Be Dismissed for Failure to State a Claim ........................................................ 48

    A.    The First Amendment Does Not Permit a Local Government Agency to Violate State Housing Laws ........................................................................ 48

        1.    The City Officials Do Not Have a Protected First Amendment Right in their Legislative Votes .................................................... 48

        2.    The Purported Free Speech Violation Caused by the City's CEQA Obligations Will Not Materialize ........................................... 51

    B.    Appellants' Due Process Claims Are Without Merit ....................................................................... 54

        1.    Appellants Have No Procedural Due Process Right to Challenge the State's Housing Laws or RHNA Allocations ................................ 54

        2.    Appellants' Substantive Due Process Claim Fails ................................................................. 56

            a.    The City Has No Fundamental Constitutional Right to Control Land Use ........................................................ 56

            b.    The State's Housing Laws Easily Pass Rational Basis Review ............................. 58

    C.    Appellants' Dormant Commerce Clause Claim is Without Merit ................................................................ 59

    D.    All State Law Claims Should Be Dismissed ................ 60

4

**TABLE OF CONTENTS**
**(continued)**

**Page**

Conclusion ................................................................................ 63

# TABLE OF AUTHORITIES

**Page**

## CASES

*Al-Qarqani v. Chevron Corp.*
8 F.4th 1018 (9th Cir. 2021) .................................................... 28

*Branson School District Re-82 v. Romer*
161 F.3d 619 (10th Cir. 1998) ................................................. 32

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*
149 F.3d 971 (9th Cir. 1998) .................................................... 54

*Buckingham v. Sec'y of U.S. Dep't of Agr.*
603 F.3d 1073 (9th Cir. 2010) ................................................. 55

*Buena Vista Gardens Apartments Assn. v. City of San Diego
Planning Dept.*
175 Cal.App.3d 289 (1985) ..................................................... 57

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*
136 F.3d 1360 (9th Cir. 1998) ........................................ *passim*

*California Renters Legal Advoc. & Educ. Fund v. City of San
Mateo*
68 Cal.App.5th 820 (2021) ......................................... 36, 52, 57

*City of Coronado v. San Diego Ass'n of Governments*
80 Cal.App.5th 21 (2022) ......................................................... 19

*City of Irvine v. Southern Cal. Ass'n of Governments*
175 Cal.App.4th 506 (2009) ..................................................... 19

*City of Los Angeles v. David*
538 U.S. 715 (2003) .................................................................. 55

*City of Redondo Beach v. Padilla*
46 Cal.App.5th 902 (2020) ........................................... 34, 35, 36

## TABLE OF AUTHORITIES
### (continued)

Page

*City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency*
625 F.2d 231 (9th Cir. 1980) ........................................................... *passim*

*City of San Juan Capistrano v. California Pub. Utilities Comm'n*
937 F.3d 1278 (9th Cir. 2019) ...................................................... 31, 32, 38

*Communications Telesystems Int'l v. California Pub. Utility Comm'n*
196 F.3d 1011 (9th Cir. 1999) .................................................................. 46

*Cook v. Harding*
879 F.3d 1035 (9th Cir. 2018) .................................................................. 44

*Credit One Bank, N.A. v. Hestrin*
60 F.4th 1220 (9th Cir. 2023) .................................................................. 45

*CTS Corp. v. Dynamics Corp. of Am.*
481 U.S. 69 (1987) ..................................................................................... 59

*Cty. of Ocean v. Grewal*
475 F.Supp.3d 355 (D.N.J. 2020) ............................................................. 32

*Dep't of Revenue v. Davis*
553 U.S. 328 (2008) ................................................................................... 59

*Franceschi v. Yee*
887 F.3d 927 (9th Cir. 2018) .................................................................... 56

*Garcetti v. Ceballos*
547 U.S. 410 (2006) .............................................................................. 40, 50

*Gov't Employees Ins. Co. v. Dizol*
133 F.3d 1220 (9th Cir. 1998) .................................................................. 62

*Harper v. Public Service Comm'n of West Va.*
396 F.3d 348 (4th Cir. 2005) .................................................................... 46

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Hawaii Housing Auth. v. Midkiff*
467 U.S. 229 (1984)................................................................. 45

*Haytasingh v. City of San Diego*
66 Cal.App.5th 429 (2021) ..................................... 34, 35, 36, 37

*Herman Fam. Revocable Tr. v. Teddy Bear*
254 F.3d 802 (9th Cir. 2001) ................................................ 61

*Hollingsworth v. Perry*
(2013) 570 U.S. 693............................................................. 37

*Hunter v. City of Pittsburgh*
207 U.S. 161 (1907)........................................................ *passim*

*Huth v. Hartford Ins. Co. of the Midwest*
298 F.3d 800 (9th Cir. 2002) ......................................... 61, 62

*Johnson v. Riverside Healthcare System, LP*
534 F.3d 1116 (9th Cir. 2008) ....................................... 27, 28

*Kroessler v. CVS Health Corp.*
977 F.3d 803 (9th Cir. 2020) ................................................ 43

*Lane v. Franks*
573 U.S. 228 (2014)............................................................. 40

*Lindke v. Freed*
601 U.S. __ (2024), slip op............................................. 39, 50

*Mathews v. Eldridge*
424 U.S. 319 (1976)............................................................. 55

*Middlesex County Ethics Committee v. Garden State Bar Ass'n*
457 U.S. 423 (1982).............................................................. 44

8

## TABLE OF AUTHORITIES
### (continued)

Page

*Mont. Shooting Sports Ass'n v. Holder*
    727 F.3d 975 (9th Cir. 2013) ................................................................... 27

*Mullins v. Oregon*
    57 F.3d 789 (9th Cir. 1995) ..................................................................... 56

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
    682 F.3d 1144 (9th Cir. 2012) ................................................................. 59

*Nationwide Biweekly Admin., Inc. v. Owen*
    873 F.3d 716 (9th Cir. 2017) ................................................................... 45

*Nevada Comm'n on Ethics v. Carrigan*
    564 U.S. 117 (2011) ..................................................................... 49, 50, 51

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*
    477 U.S. 619 (1986) ................................................................................ 46

*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984) .................................................................................. 24

*Pennzoil Co. v. Texaco, Inc.*
    481 U.S. 1 (1987) .................................................................................... 46

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*
    754 F.3d 754 (9th Cir. 2014) ............................................................ 24, 44

*Rogers v. Brockette*
    588 F.2d 1057 (5th Cir. 1979) ................................................................ 32

*Romero-Ochoa v. Holder*
    712 F.3d 1328 (9th Cir. 2013) ................................................................ 58

*Ruegg & Ellsworth v. City of Berkeley*
    63 Cal.App.5th 277 (2021) ..................................................................... 57

## TABLE OF AUTHORITIES
### (continued)

Page

*S. Pac. Co. v. State of Ariz.*
   325 U.S. 761 (1945).................................................................. 59

*Scott v. Pasadena Unified School Dist.*
   306 F.3d 646 (9th Cir. 2002) ................................................ 61

*Sequoyah Hills Homeowners Ass'n v. City of Oakland*
   23 Cal.App.4th 704 (1993) ..................................................... 53

*Shulman v. Kaplan*
   58 F.4th 404 (9th Cir. 2023) ...................................... 27, 29, 39

*Tiburon Open Space Comm. v. Cnty. of Marin*
   78 Cal.App.5th 700 (2022) ..................................................... 53

*Tweed-New Haven Airport Authority v. Tong*
   930 F.3d 65 (2nd. Cir. 2019) ................................................. 32

*United States v. Johnson*
   256 F.3d 895 (9th Cir. 2001) ................................................ 33

*United States v. Morros*
   268 F.3d 695 (9th Cir. 2001) ................................................ 44

*Williams v. Mayor & City Council of Baltimore*
   289 U.S. 36 (1933)................................................................... 30

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008).................................................................... 23

*Wood v. City of San Diego*
   678 F.3d 1075 (9th Cir. 2012) ........................................ 28, 48

*Young v. United States*
   769 F.3d 1047 (9th Cir. 2014) .............................................. 27

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Younger v. Harris*
  401 U.S. 37 (1971)..............................................................*passim*

*Ysursa v. Pocatello Educ. Ass'n*
  555 U.S. 353 (2009).......................................................... 31, 38

**STATUTES**

28 U.S.C.
  § 1367(c)(2) ...................................................................... 61
  § 1367(c)(3) ...................................................................... 61
  § 2201(a) ........................................................................... 61

Cal. Elec. Code
  § 14052 .............................................................................. 34
  § 14052 subd. (a) ............................................................. 35

## TABLE OF AUTHORITIES
### (continued)

**Page**

Cal. Gov. Code

   § 65000 through 66300 ............................................................. 47

   § 65302 subd. (c) .............................................................. 17, 52

   § 65580 .................................................................... 17, 52, 58

   § 65583 ............................................................................. 17

   § 65584 ............................................................................. 18

   § 65584 subd. (b) ................................................................. 18

   § 65584.04 subd. (a) ............................................................. 19

   § 65584.05 .................................................................. 19, 20, 55

   § 65584.05 subd. (a) ............................................................. 19

   § 65584.05 subd. (f) ............................................................. 19

   § 65585 subd. (i) ................................................................. 63

   § 65585 subd. (b) ................................................................. 17

   § 65585 subd. (b)(3) ............................................................. 18

   § 65585 subd. (e) ................................................................. 18

   § 65585 subd. (f) ............................................................. 18, 63

   § 65588 ............................................................................. 17

   § 65589.5 subd. (d)(5) ........................................................... 52

   § 65754 subd. (a) ................................................................. 53

   § 65759 subd. (a) ................................................................. 53

   § 65913.4 .......................................................................... 57

Cal. Harb. & Nav. Code

   § 650.1 ............................................................................ 35

   § 655.2 ......................................................................... 34, 35

Cal. Pub. Res. Code

   § 21081 subd. (a)(3) ............................................................. 53

   § 21081 subd. (b) .............................................................. 51, 53

# TABLE OF AUTHORITIES
## (continued)

**Page**

CONSTITUTIONAL PROVISIONS

United States Constitution
    1st Amendment ................................................................ *passim*
    11th Amendment ....................................................... 24, 25, 60
    14th Amendment ................................................................ 56

COURT RULES

Ninth Circuit Rule 28-2.2 ............................................................ 16

**INTRODUCTION**

Huntington Beach is a political subdivision of the State of California. Like some political subdivisions across the state and the nation, Huntington Beach prefers to impose land use policies that tend to foreclose new housing units from being developed—particularly affordable housing. But California law (in this case, the Housing Element Law) requires Huntington Beach to accommodate the development of new housing—across all household income levels—by periodically updating the housing element portion of its general plan. The Housing Element Law specifies what each local government's housing element must include—such as identifying developable sites, addressing fair housing concerns, and removing potential constraints to housing development, among others. Adoption of a housing element is not optional. But Huntington Beach does not want to follow the Housing Element Law.

After facing a lawsuit in state court for violating the state's housing laws, the City, the Mayor, the Mayor Pro Tem, and the City Council of Huntington Beach (collectively, the "Appellants") filed the instant action in federal court, alleging federal constitutional violations, along with state law claims. However, for purposes of federal constitutional law, Huntington

Beach is a political subdivision of the State of California, and thus lacks standing to raise its claims against its parent state. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907); *City of S. Lake Tahoe v. California Tahoe Reg'l Plan. Agency,* 625 F.2d 231, 233–34 (9th Cir. 1980). As this Court has previously held, this is true for charter cities as well as general law cities. *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998). Similarly, elected officials who "wish not to enforce a statute due to private constitutional predilections" also lack standing to assert federal constitutional claims against the state. *City of S. Lake Tahoe, supra,* 625 F.2d at 238. Accordingly, the District Court dismissed the case without leave to amend, and declined to exercise supplemental jurisdiction over the remaining state law claims.

The District Court's ruling falls squarely within the confines of this Court's precedents, and Appellants fail to cite any authority to the contrary. All Appellants can muster to support their novel theory that a particular type of municipality created under state law—a charter city—enjoys special constitutional solicitude that no court has ever recognized are California appellate decisions that interpreted particular state statutes, none of which are relevant here.

15

As such, no federal court has jurisdiction over this action, and this lawsuit should proceed no further. In the alternative, this Court could affirm the District Court on grounds of abstention, or for Appellants' manifest failure to state any federal claims constituting a viable cause of action. For any of these reasons, Defendants and Appellees Gavin Newsom, Gustavo Velasquez, and the California Department of Housing and Community Development (HCD) (collectively, "Appellees" or the "State") urge this Court to affirm the dismissal of this action.

## STATEMENT OF JURISDICTION

Pursuant to Ninth Circuit Rule 28-2.2, Appellees state their agreement with the jurisdictional statement provided in Appellants' brief.

## ISSUE PRESENTED

Does a charter city, which is a municipal corporation, have standing to bring federal constitutional challenges to the laws of its parent state, notwithstanding this Court's holding in *South Lake Tahoe* and its progeny?

///

///

///

///

## STATEMENT OF THE CASE

**I.    STATEMENT OF FACTS**

**A.    The Housing Element Law**

Appellants object to the statutory scheme set forth at Cal. Gov. Code § 65580 *et seq*., known as the "Housing Element Law."[1] The Housing Element Law requires housing elements to be periodically updated to accommodate regional housing needs. All local governments must include a housing element as part of their general plan. Cal. Gov. Code § 65302(c).

Housing elements govern how local governments will foster the development of housing affordable to all economic segments of the community during the period in which they are in effect. Cal. Gov. Code § 65583. Localities must update their housing elements in periodic "cycles" of 8 years to accommodate regional housing needs for residents across all income levels (very low-, low-, moderate-, and above moderate). Cal. Gov. Code § 65588. This is commonly referred to as the Regional Housing Needs Allocation (RHNA) process, which is detailed *infra*.

In updating their housing elements, local governments must prepare a draft housing element for review by HCD. Cal. Gov. Code § 65585(b). HCD

---

[1] Article 10.6 of Chapter 3 of Division 1 of Title 7 of the California Government Code.

reviews the draft and issues findings on whether it substantially complies with Housing Element Law. Cal. Gov. Code § 65585(b)(3), (e). If it does not, then the local government may either conform the draft housing element to HCD's comments or adopt it without changes. Cal. Gov. Code § 65585(f). If it does the latter, it must explain why it believes its rejected draft nonetheless complies with Housing Element Law. *Id.*

**B.    Huntington Beach's RHNA Was Developed and Decided Through a Neutral Process, with Full Participation by the City**

The RHNA process is designed to bring local zoning and planning into alignment with the state's regional housing needs. RHNA is the foundation for each local government's housing element's land-inventory requirement. *See* Cal. Gov. Code § 65584 *et seq*. Briefly, in each housing element cycle, HCD relies on data supplied by the Department of Finance to assign a target number or goal for additional housing units in each region of the state. This projection of additional housing units includes projected household growth across all income levels, and final determination of regional housing needs are made in consultation with the appropriate regional council of governments. Cal. Gov. Code § 65584(b). Each council of government, including the Southern California Association of Governments (SCAG), of

18

which the City is a member, then allocates its assigned number of housing units to its member jurisdictions.

This regional allocation is determined exclusively by regional councils with their member jurisdictions, though the proposed methodology is made in consultation with HCD. Cal. Gov. Code § 65584.04(a). The draft allocation is distributed to member jurisdictions at least 18 months prior to the scheduled housing element revision deadline. Cal. Gov. Code § 65584.05(a). A member jurisdiction wishing to appeal its draft allocation must then do so, to its regional council of government, within 45 days. Cal. Gov. Code § 65584.05. Final allocations are adjusted based upon the results of the administrative appeals, but the total distribution of housing need shall not equal less than the regional housing needs determination. Cal. Gov. Code § 65584.05(f). Once appeals to the regional council of governments are exhausted, no further appeals are permitted. The final allocation resulting from this process is not subject to judicial review. *City of Irvine v. Southern Cal. Ass'n of Governments*, 175 Cal.App.4th 506, 522 (2009); *City of Coronado v. San Diego Ass'n of Governments*, 80 Cal.App.5th 21, 28 (2022).

HCD provided SCAG with its total RHNA numbers for the current cycle on October 15, 2019. SER-138. After deliberations and public feedback, SCAG issued its final methodology for allocating its RHNA numbers on March 5, 2020. SER-139. SCAG released its Draft RHNA allocations on or about September 11, 2020. *Id.* Pursuant to Cal. Gov. Code § 65584.05, Huntington Beach appealed its RHNA allocation and participated fully in the RHNA appeal process before SCAG's RHNA Appeals Board. SER-141-142. SCAG considered the City's arguments at hearings held on January 19 and 25, 2021, and ultimately voted to deny the City's appeal. SER-127, 149.

SCAG then issued its final RHNA allocations, after modifications, on July 1, 2021, including a RHNA allocation for Huntington Beach of 13,368 housing units. SER-151, 154. That RHNA allocation thus became final.

### C. Huntington Beach Fails to Revise Its Housing Element in Accordance with State Law

Following the finalization of RHNA requirements for the current planning cycle, the City's staff prepared a draft housing element for review by HCD. It sent its initial draft to HCD on December 7, 2021 and, after several rounds of revisions and feedback, arrived at its final draft housing element in September 2022. SER-158. HCD informed the City by letter

20

dated September 30, 2022 that its revised draft housing element would, if adopted, comply with the Housing Element Law. *Id.* The City did not adopt that draft housing element.

HCD then notified the City that it was out of compliance with the Housing Element Law in February and March of 2023. 3-ER-541. The City Council considered the draft housing element at its meeting on March 21, 2023, but deadlocked on adopting the element. *Id.* When the City brought up the housing element at its next meeting on April 4, 2023, it rejected it. *Id.*

The State filed a lawsuit in Orange County Superior Court on March 8, 2023, seeking to compel the City's compliance with state housing laws.[2] SER-72-90. The next day, the City filed the instant action in the Central District of California, seeking to enjoin the enforcement of the entirety of California's Planning and Zoning Laws against them. 4-ER-685-743.

///

///

///

---

[2] The State initially sued to challenge Huntington Beach's illegal enactment of a moratorium on certain housing projects, including accessory dwelling unit (ADU) projects, in contravention of state law. The State amended its petition to challenge the City's failure to adopt a housing element on June 9, 2023.

## II.    STATEMENT OF PROCEDURE

### A.    Plaintiffs' Complaint

Appellants' initial complaint of March 9, 2023 asserted eleven causes of action against Governor Gavin Newsom, Gustavo Velasquez in his official capacity as HCD Director, HCD, SCAG, and the California State Legislature. Appellants alleged all defendants violated the United States Constitution's First Amendment, the Fourteenth Amendment's guarantee of procedural due process, the Fourteenth Amendment's guarantee of substantive due process, the Commerce Clause, the California Constitution's provisions regarding charter city authority, the state's own RHNA laws, the California Constitution's provisions regarding separation of powers, the California Constitution's prohibition on bills of attainder, CEQA, and the California Constitution's prohibition on special statutes. Appellants also alleged fraud. 4-ER-685-743.

On March 14, Appellants filed an application for a temporary restraining order (TRO) that would prevent the State from enforcing its housing laws against the City. SER-174-204. Appellants claimed that the emergency warranting temporary relief was their pending consideration of the draft housing element—which the City itself had drafted—at the March 21, 2023 city council meeting. SER-181. After receiving opposition briefs

22

from all parties then in the case, the District Court denied the application, finding Appellants had failed to fulfill any of the four factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). SER-161-173.

On March 27, 2023, Appellants amended their complaint, dropping the State Legislature as a defendant. 4-ER-621-684. All defendants remaining in the case then moved to dismiss the amended complaint.

### B. Defendants' Motions to Dismiss

The State and SCAG filed separate motions to dismiss on May 1, 2023. 3-ER-548-582; 4-ER-584-620. The State moved to dismiss the complaint on several grounds. First, the State argued that Appellants lacked standing to bring any claims. 3-ER-566-568. Under long-standing Supreme Court precedent, political subdivisions of states do not possess federal constitutional rights that may be asserted against their states. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). This holds true for elected officials of political subdivisions. *See City of S. Lake Tahoe,* 625 F.2d at 237-238. Second, the State argued the District Court should abstain from hearing the case under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). 3-ER-568-570. The state court action, filed before Appellants'

action, was ongoing, implicated important state land use interests, and provided adequate opportunity to raise Appellant's federal claims. In addition, Appellants' requested relief would indisputably have had the effect of enjoining ongoing state court proceedings. *See ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014). Next, the State argued the Eleventh Amendment barred all of Appellants' state-law claims against all state defendants, and all state *and* federal claims against Defendants Newsom and HCD. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984). 3-ER-570-572. Lastly, the State argued that Appellants failed to state any cognizable federal claims, and that the remaining state law claims should be dismissed once the federal claims had been dismissed for failure to state a claim or for lack of subject matter jurisdiction. 3-ER-572-580.

## C. Plaintiffs' Opposition and Defendants' Replies

Appellants filed their opposition on June 6, 2023. They argued that the City Officials all possessed standing as individuals whose free speech rights were being injured by housing laws applicable solely to cities. 3-ER-402-405. Appellants further argued that California state appellate decisions established that charter cities are not political subdivisions under the

24

California Constitution, and urged the court not to follow Ninth Circuit precedent barring political subdivision standing for that reason. 3-ER-406-408.

Appellants conceded that the Eleventh Amendment barred all its claims against HCD directly, and conceded that their state-law claims against defendants Newsom and Velasquez were barred, but nonetheless asserted that the *Ex Parte Young* exception saved their federal claims against the latter two. 3-ER-408-410. Appellants also incorrectly asserted that *Younger v. Harris* would not apply to their action because *Younger* involved a criminal prosecution, not a civil enforcement action, and further incorrectly asserted that *Younger* abstention could only be invoked by a plaintiff. 3-ER-410-412. Lastly, Appellants argued they had stated plausible claims for relief for all their federal and state causes of action. *See generally*, 3-ER-412-429.

The State and SCAG filed replies on June 22, 2023, reiterating their requests that the District Court dismiss the case in its entirety. 2-ER-36-53, 57-72.

/// 

///

25

### D.   The District Court's Minute Order

In a minute order dated November 13, 2023, the District Court dismissed Appellants' action in its entirety. 1-ER-2-16. The District Court held that no plaintiff had standing to bring the action. With respect to the City, the District Court held that *South Lake Tahoe* barred the action because political subdivisions of states may not assert violations of constitutional rights against their states. 1-ER-11-12. The District Court also found that this Court's holding in *Burbank* clarified that whether a city is a general law city or a charter city has no bearing on the question of standing. 1-ER-12. And with respect to the City Officials, the District Court found that *South Lake Tahoe* barred their claims because public officials lack standing to assert constitutional claims that seek to redress private constitutional predilections. 1-ER-11. The District Court declined to exercise supplemental jurisdiction over the state law claims. 1-ER-13-15. Finding that no amendment could cure the fatal defects in the federal constitutional claims, the District Court denied Appellants leave to amend. 1-ER-15-16.

This appeal followed.

### E.   Appellants' Emergency Motion

After failing to obtain a stay of the state court action from the California Court of Appeal, Appellants filed an Emergency Motion to Enjoin

26

State Court Proceedings with this Court on February 6, 2024. *See* Dkt. 17.1. Appellants claimed a likelihood of success on the merits based on substantially the same arguments they advance in their Opening Brief, and alleged that a judgment in the state court case would constitute irreparable harm because Appellants would be forced to make a statement respecting the need for housing with which they did not agree. After receiving the State's Opposition on February 14, this Court denied the Emergency Motion in an order filed February 22, 2024. Dkt. 26; 29.

## STANDARD OF REVIEW

This Court reviews an order granting a 12(b)(1) motion to dismiss *de novo. Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014). In reviewing an order granting a motion to dismiss, an appellate court accepts as true all well-pleaded allegations in the complaint, construing the factual allegations in favor of plaintiffs. *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013); *Shulman v. Kaplan*, 58 F.4th 404, 407 (9th Cir. 2023). Standing determinations are reviewed *de novo*. *Shulman*, 58 F.4th at 407.

This Court may affirm the ruling under review if the decision is correct on any ground appearing in the record. *Johnson v. Riverside Healthcare*

27

*System, LP,* 534 F.3d 1116, 1121 (9th Cir. 2008). This is true even where a district court dismisses a case on jurisdictional grounds but could have dismissed a case on the merits. *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1026-1027 (9th Cir. 2021); *Wood v. City of San Diego*, 678 F.3d 1075, 1086 (9th Cir. 2012).

## SUMMARY OF THE ARGUMENT

In an apparent concession that its federal due process and Commerce Clause claims are without merit, the City casts its lawsuit as a simple "compelled-speech case" seeking to vindicate the First Amendment rights of the City and the City Officials. See, e.g., Dkt. 11.1 at p. 39. This is misleading. The City's lawsuit seeks to invalidate the entirety of the State of California's Housing Element Law because the City would prefer to enact different land use policies than those required by state law—indeed, that is precisely the relief the City asked for in the court below. *See* 4-ER-680-683. This Court's precedent, not to mention Supreme Court precedent, prohibits federal courts from entertaining such a claim.

As the District Court correctly held, no plaintiffs have standing to bring this action. The City does not possess judicially-enforceable federal constitutional rights vis-à-vis the state that created it. The City's status as a

28

"charter city" under the California state constitution is irrelevant to the question of whether it is a "political subdivision" under the *federal* Constitution for standing purposes. And the City's attempted end-run around this Court's *per se* bar to political subdivision standing by claiming injury to the free-speech rights of its elected officials is already foreclosed by this Court's own precedent. The District Court correctly dismissed Appellants' action without leave to amend because Appellants cannot plead around this jurisdictional bar.

In the alternative, this Court could affirm the District Court's decision to dismiss the action based on the principles of abstention announced in *Younger v. Harris*, which was fully briefed in the District Court below. This Court could also affirm the dismissal due to the City's failure to plead any cognizable claims for relief.

## ARGUMENT

### I.  THE CITY DOES NOT HAVE STANDING

The District Court's determination as to whether a party has standing is reviewed *de novo*. *Shulman*, 58 F.4th at 407.

///

///

29

### A. The Federal Constitution Does Not Protect Political Subdivisions of States

The Supreme Court decided the outcome of this case over a century ago. "Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be [e]ntrusted to them." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). Thus, subject only to its own state constitution, a state may establish, disestablish, restrain, or empower its agencies as it sees fit. "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933). Simply put, a state's political subdivisions *do not have* federal constitutional rights that they may assert against their parent states.

In its attempt to argue otherwise, the City cites cases discussing the free speech rights of nonprofit organizations and private corporations. *See* Dkt. 11.1 at p. 46 (citing, inter alia, *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).) These cases are inapposite. And the City's deliberate failure to cite cases that discuss the rights of *municipal* corporations is

telling. Indeed, the Supreme Court has explicitly rejected the City's argument that municipal corporations may hold the same constitutional status as private corporations. *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (comparing rights of private corporations to political subdivisions, which have "no privileges or immunities under the federal constitution" against their creators).

Just as the Supreme Court has held that municipal corporations lack federally enforceable constitutional rights against their parent states, this Court has held municipal corporations and their political leadership lack standing to bring such claims in federal court. That has been the law of this circuit for over four decades. *See City of South Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233-234 (9th Cir. 1980). Since 1980, this Court has maintained and repeatedly reaffirmed a *per se* rule barring municipal governments and members of their legislative bodies from asserting federal challenges to state laws that govern municipal operations. *See id*.; *see also City of San Juan Capistrano v. California Pub. Utilities Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019) (collecting cases). And this Court has already ruled that the same *per se* bar applies to actions brought by charter cities. *Burbank-Glendale-Pasadena Airport Auth. v. City of*

31

*Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998). The *per se* rule is, in other words, a jurisdictional bar against municipalities—chartered or not—asserting federal claims against their states.[3]

Notably, Appellants' brief does not ask this Court to revisit *South Lake Tahoe*. Instead, the City argues that its status as a charter city exempts it from this Court's broad and longstanding jurisdictional bar to municipal standing. *See* Dkt. 11.1 at 53-54. But the City cites no *federal* authority for the proposition that charter cities enjoy such special solicitude. And it cannot. *Burbank*'s application of *South Lake Tahoe* to charter cities controls as the law of the Ninth Circuit. *See Burbank*, 136 F.3d at 364; *see also City of San Juan Capistrano*, 937 F.3d at 1281 ("Here, *South Lake Tahoe*, and

---

[3] In a footnote, Appellants argue that *South Lake Tahoe* "has become an outlier, with this Ninth Circuit standing alone in denying standing to 'political subdivisions.'" Dkt. 11.1 at p. 54, fn. 5. In support of this contention, Appellants cite to *Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65 (2nd. Cir. 2019), *Branson School District Re-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998), and *Rogers v. Brockette*, 588 F.2d 1057, 1065 (5th Cir. 1979), while incorrectly citing a New Jersey district court opinion as a Third Circuit decision. *See Cty. of Ocean v. Grewal*, 475 F.Supp.3d 355, 369 (D.N.J. 2020); *cf* Dkt. 11.1 at p. 54, fn. 5. Appellants fail to mention that these cases only recognized a limited exception to standing doctrine permitting Supremacy Clause challenges by political subdivisions in those courts. Thus, Appellants' action would be barred even if brought in the Second, Fifth, or Tenth Circuits–or in the District of New Jersey.

the decisions in *Burbank*, *Palomar*, and *Okanogan* applying it, control as the law of the circuit.").

The City asks this Court to treat *Burbank*'s discussion of a charter city's status as "political subdivisions" as dicta. Dkt. 11.1 at 56-59. But in *Burbank*, this Court applied *South Lake Tahoe* to bar municipal standing and, in doing so, *expressly rejected* an argument "that because Burbank is a charter city, rather than a general law city, it is not a political subdivision for the purposes of its ability to challenge a state statute." *Burbank*, 136 F.3d at 1364. Indeed, the very basis for the lower court's decision to dismiss that case was because the plaintiff was "a political subdivision of the State of California and [could not] challenge the constitutionality of the statute" at issue. *Id.* at 1362. A charter city's status as a political subdivision under the federal constitution was directly relevant to the resolution of *Burbank*, was decided in a published opinion after this Court received briefing and argument, and therefore controls as law of this circuit. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit. . .").

33

### B.    The State Appellate Cases the City Cites are Inapposite and Irrelevant

The core of the City's argument that charter cities are not political subdivisions for federal constitutional purposes relies on state appellate decisions interpreting state statutes unrelated to this present appeal. This argument not only overstates the breadth of the California Court of Appeal's holding in each case, it also demonstrates a fundamental misunderstanding of the relationship between the state and federal court systems.

The City claims that *City of Redondo Beach v. Padilla*, 46 Cal.App.5th 902 (2020) and *Haytasingh v. City of San Diego*, 66 Cal.App.5th 429 (2021) establish that charter cities "*are not political subdivisions of the State*." Dkt. 11.1 at p. 50 (emphasis in original). These cases held nothing of the sort. Both cases, each interpreting the applicability of California state statutes (Elections Code § 14052 and Harbors and Navigation Code § 655.2, respectively) merely confirmed that the state legislature generally specifies whether the term "political subdivision" includes charter cities for purposes of particular state statutes.

In *Redondo Beach*, the City of Redondo Beach filed a petition for writ of mandate against the California Secretary of State, seeking to prevent the application of the California Voter Participation Rights Act to the city. That

law provided that a "political subdivision" would be required to hold its local elections on a statewide election date if holding an election on a nonconcurrent date previously resulted in a significant decrease in voter turnout. Cal. Elec. Code § 14052(a). Redondo Beach argued that the term "political subdivision" in this statute did not encompass charter cities. The Court of Appeal agreed, holding that the Legislature is usually specific when it intends the term "political subdivision" to include charter cities for purposes of a particular statute. *Redondo Beach*, 46 Cal.App.5th at 912-913.

In *Haytasingh*, a surfer unsuccessfully sued the City of San Diego after a city lifeguard's allegedly negligent operation of a jet ski caused him serious injuries. On appeal, the plaintiffs argued the court should have instructed the jury that California Harbors and Navigation Code section 655.2, which provides a default speed limit of five miles per hour for vessels operated in state waters, also applied to city lifeguards. The plaintiffs argued that an exemption in section 650.1, which provides that such limit shall not apply to vessels "whose owner is a state or subdivision thereof," only exempted the State and its constituent counties. *Haytasingh*, 66 Cal.App.5th at 458. The city, for its part, argued that it was in fact a "subdivision" of the state for purposes of that statute and therefore fell under the speed limit

35

exemption. *Id*. The Court of Appeal held the city was not a "subdivision" whose vessels were exempt from the speed limit, citing *Redondo Beach*'s instruction that the Legislature is "usually quite specific" when it intends the term "political subdivision" to apply to cities, particularly charter cities. *Id.* at 460.

Both *Haytasingh* and *Redondo Beach*, therefore, turned on issues of statutory interpretation—namely, whether the Legislature intended the term "political subdivision" or "subdivision" to include charter cities for the purposes of particular state statutes.[4] What these cases did *not* do, however, is establish a general proposition that charter cities are not political subdivisions of the state. Indeed, both cases explicitly recognized that the Legislature can and often does define the term "political subdivision" to *include* charter cities. *See Redondo Beach*, 46 Cal.App.5th at 913; *Haytasingh*, 66 Cal.App.5th at 460-461.

_____

[4] This distinction is important in the context of state statutory interpretation. Under the California Constitution, charter cities are generally free to govern municipal affairs except for those areas (such as housing) that are matters of "statewide concern." *See California Renters Legal Advoc. & Educ. Fund v. City of San Mateo*, 68 Cal.App.5th 820, 846-847 (2021). Thus, a failure to specify whether charter cities are covered by a generally-applicable state law is significant, as it could be read as legislative intent to exempt charter cities from a particular law.

And ultimately, both cases only decided the issue under the California Constitution and in the context of state law principles of statutory interpretation. In fact, *Haytasingh* expressly *acknowledged* that municipalities are "political subdivisions" of the state for federal constitutional purposes. *See* 66 Cal.App.5th 429, 461-462 (2021) (discussing *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907)). As the *Haytasingh* court held, "California, alone has the power to determine how to define a municipal corporation and confer on it whatever power it sees fit." *Id*. at 462 (discussing *Hunter*). But for *federal* constitutional purposes, the U.S. Supreme Court's use of the term "political subdivision of the state" serves to describe "the function and derivation of municipal corporations, not as a legal definition for all purposes." *Id*. Nothing in *Haytasingh* suggests that the California Legislature intended the Harbors and Navigation Code to usher in a sea change in how the U.S. Constitution governs purely intrastate governmental relations.

Regardless of how California judicial decisions interpret the California Legislature's discrete uses of the term "political subdivision," the question of standing in this case is exclusively a federal issue. *See Hollingsworth v. Perry* (2013) 570 U.S. 693, 715 ("[S]tanding is a question

37

of federal law, not state law."). Under this Court's precedents, the City, as a municipal corporation organized under the State of California, does not have standing to bring a federal constitutional challenge to a California statute. *San Juan Capistrano*, 937 F.3d at 1281.

Supreme Court precedent dictates this outcome. As it reaffirmed in 2009, "'[p]olitical subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities.'" *Ysursa v. Pocatello Educ. Ass'n* (2009) 555 U.S. 353, 362 (quoting *Reynolds v. Sims*, 377 U.S. 533, 575 (1964)). Instead, for federal constitutional purposes, "[a] political subdivision… is a subordinate unit of government created by the State to carry out delegated governmental functions." *Id.* at 363. While a "private corporation enjoys constitutional protections… a political subdivision, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Id.* (internal quotations and citations omitted).

Thus, the City, as a political subdivision of the State of California for federal constitutional purposes, does not have standing to sue. The District Court recognized this and correctly dismissed the City's claims.

38

## II.  THE ELECTED CITY OFFICIALS DO NOT HAVE STANDING

The District Court's determination as to the City Officials' standing is also reviewed *de novo*. *Shulman*, 58 F.4th at 407.

The City's dismissed complaint also includes as plaintiffs the City Council, the Mayor, and Mayor Pro Tem of Huntington Beach (collectively, the "City Officials"), all suing in their capacities as elected officials of Huntington Beach. The City Officials claim that the state's housing laws unconstitutionally compel them to make statements with which they do not agree. Such an argument is squarely precluded by this Court's precedent.

In its Opening Brief, the City insists that City Officials are individuals who possess free speech rights. *See, e.g.*, Dkt. 11.1 at p. 45 ("Mayor Tony Strickland and Mayor Pro Tempore Gracey Van Der Mark were individual freedom-loving Americans as they ran for City Council. They did not agree to forfeit or curtail their constitutional rights when running for office."). The State does not dispute that the City Officials possess free speech rights *as individuals*. *See Lindke v. Freed*, 601 U.S. __ (2024), slip op. at pp. 7-8. But the City Officials are *not* suing as private individuals. They are suing as elected officers of the Huntington Beach city government, claiming a novel constitutional interest in the conduct of their official duties, in clear defiance

39

of Supreme Court precedent. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Lane v. Franks*, 573 U.S. 228, 236, 240 (2014).

The City Officials do not, and never have, asserted any constitutional interest separate and distinct from the City's interests. And they cannot, because the state's housing laws impose obligations on *cities*, not on city officials.[5] Any interest of the City Officials is entirely derivative of the City's interests. *See South Lake Tahoe,* 625 F.2d at 237.

The city attempts to salvage its attempted end-run around *South Lake Tahoe*'s bar by claiming the state's housing laws unconstitutionally compel councilmembers to engage in "speech" about housing needs. Dkt. 11.1 at pp. 60-61. But *South Lake Tahoe* forecloses this line of argument. In that case, the mayor and members of the South Lake Tahoe city council were co-plaintiffs with the city proper. *South Lake Tahoe*, 625 F.2d at 237. These officials asserted they had standing as individuals because either (1) they would refuse to enforce regulations they believed unconstitutional, thereby

---

[5] For that reason, and *contra* the City's assertions in Dkt. 11.1 at pp. 66-67, the District Court properly declined to take judicial notice of the State's pending state court action. The City never articulated any theory under which a state enforcement action requiring the City to follow the state's housing laws would generate an injury-in-fact to the city councilmembers except in their roles as government officials.

violating their oaths of office and being subject to state prosecution, or (2) they would enforce unconstitutional regulations and be subject to civil liability from aggrieved citizens. *Id.* at 237-239.

This Court rejected both arguments. It held that "[t]o confer standing on public officials because they wish not to enforce a statute due to private constitutional predilections… would convert all officials charged with executing statutes into potential litigants, or attorneys general, as to laws within their charge." *Id.* at 238. Further, any "personal dilemma" that a councilmember may harbor in complying with state law cannot confer standing because the councilmember lacks any "concrete personal injury" that differs from the consequences to the city itself. *Id.* at 237.

Notably, the City Officials' arguments in the present case closely track both standing arguments advanced in *South Lake Tahoe*. The City Officials argue that they are faced with a choice of either (1) refusing to follow an unconstitutional state law and being subject to a state enforcement action, or (2) following state law and approving a supposedly legally deficient environmental impact report in violation of CEQA, opening themselves to

lawsuits.[6] *See* Dkt. 11.1 at p. 63 (arguing Plaintiffs are being sued due to the "exercise of Plaintiffs' rights and democratic responsibilities [which] resulted in an opinion contrary to the State"); p. 64 (alleging "Plaintiffs would be exposed to legal action for approving a project based on serious misrepresentations" if they voted to approve the environmental impact report). That is, the City Officials assert a "personal dilemma" in choosing whether to enforce or disobey state laws they believe to be unconstitutional. This is the *exact* theory of standing this Court rejected over forty years ago. *South Lake Tahoe*, 625 F.3d at 239.

Allowing this action to proceed would make *South Lake Tahoe*, and by extension the Supreme Court's own precedents, a dead letter. All a political subdivision would need to do to avoid the *per se* bar to standing is have its elected officials profess a subjective belief that laws that impact the political subdivision are unconstitutional. But that is not a legally sufficient injury-in-fact, and this Court should not open the loophole it specifically declined to create over forty years ago.

---

[6] This latter claim is based on a falsehood. CEQA does not impose any personal liability on local government officials when a local agency is sued for approving a legally deficient environmental impact report.

The District Court's analysis of the City Officials' claims, and its application of this Court's precedent, was exactly correct. The City Officials do not have standing to sue.

### III. THE DISTRICT COURT CORRECTLY DECLINED TO GRANT LEAVE TO AMEND

Neither the City nor the City Officials have standing to bring this action in federal court. And because none of the named plaintiffs in this action have standing, the District Court properly declined to grant Appellants leave to amend. *See* 1-ER-15-16. A district court's decision to deny leave to amend based on futility of amendment is reviewed *de novo*. *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 808 (9th Cir. 2020).

A district court may dismiss a complaint without leave to amend where it finds amendment futile: "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend." *Kroessler*, 977 F.3d at 815. Amendment is futile where "no amendment would allow the complaint to withstand dismissal as a matter of law." *Ibid*. Neither the City nor the City Officials can overcome the *per se* bar to political subdivision standing in this Circuit, so dismissal with prejudice was and is justified. *Burbank*, 136 F.3d at 1364.

///

43

## IV. IN THE ALTERNATIVE, *YOUNGER* ABSTENTION IS PROPER

Even if any of the plaintiffs in this action had standing, which they do not, the District Court could have easily dismissed Plaintiffs' claims under the *Younger* doctrine of abstention due to the vital state interests at stake. A decision to abstain on *Younger* grounds is reviewed *de novo*. *Cook v. Harding*, 879 F.3d 1035, 1038 (9th Cir. 2018).

As the State briefed to the District Court, *Younger* abstention avoids unnecessary friction in state-federal relations when parties on one side of a dispute file suit in state court and opposing parties file factually related proceedings in federal court. *Younger v. Harris*, 401 U.S. 37 (1971); *United States v. Morros*, 268 F.3d 695, 707 (9th Cir. 2001). Its purpose "is to avoid unnecessary conflict between state and federal governments." *Id. Younger* abstention is appropriate where state court proceedings (1) are ongoing; (2) implicate important state interests; and (3) provide adequate opportunity to raise the federal claims as defenses. *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 431 (1982). This Court also considers whether the requested relief will "enjoin—or have the practical effect of enjoining—ongoing state proceedings." *ReadyLink Healthcare, Inc. v. State*

44

*Comp. Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014). All of these criteria were, and are, satisfied in this case.

With respect to parallel proceedings, *Younger* abstention is properly invoked if the state proceedings were initiated "before any proceedings of substance on the merits have taken place in the federal court." *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 238 (1984). Here, the State filed suit in Orange County Superior Court against Huntington Beach and its officials on March 8, 2023, seeking a writ of mandate due to their failure to comply with state housing laws. *See* fn. 2, *supra*. A day later, on March 9, 2023, Huntington Beach filed the instant action in this Court. Since that time, the only actions the District Court took were (1) denying the City's frivolous application for a temporary restraining order and (2) ruling on the defendants' motions to dismiss. Neither of these actions qualifies as a proceeding of substance on the merits. *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 728 (9th Cir. 2017); *Credit One Bank, N.A. v. Hestrin*, 60 F.4th 1220, 1226 (9th Cir. 2023). And since that time, the state-court action has received considerable briefing and argument, with the trial court having held a hearing on the merits of the State's claim arising under the

45

Housing Element Law on March 29, 2024. The State's other claims have not yet been set for hearing and remain pending.

With respect to important state interests, California's pressing commitment to ensuring cities are in compliance with state housing laws justifies abstention. A wide variety of state interests qualify as "important" for purposes of *Younger* abstention. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc*., 477 U.S. 619, 625-629 (1986). Such vital interests include, as here, property law concerns such as land use and zoning questions. *See Harper v. Public Service Comm'n of West Va*., 396 F.3d 348, 352-353 (4th Cir. 2005) (collecting cases). The state court action clearly implicates these critical interests.

The parallel state proceedings provide Huntington Beach a full opportunity to litigate any federal claims it may be entitled to bring. State court proceedings are presumed adequate to raise the federal claim "in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 15 (1987); *Communications Telesystems Int'l v. California Pub. Utility Comm'n*, 196 F.3d 1011, 1020 (9th Cir. 1999). The state lawsuit challenges Huntington Beach's refusal to comply with valid California law, including the Housing Element Law and the RHNA allocation process.

46

Plaintiffs have every right to raise their purported federal claims as defenses in the ongoing state court action.

Finally, it is indisputable that the City's requested relief would have the practical effect of enjoining ongoing state proceedings. Huntington Beach sought relief that would, *inter alia*, enjoin the State Defendants from enforcing RHNA laws and declare the housing laws the State Defendants seek to enforce—including the *entirety* of the California Planning and Zoning Laws set forth at California Government Code § 65000 through 66300—to be unconstitutional under both the California and United States Constitutions. 4-ER-681-682. Appellants' naked objective in this litigation is to halt the State's lawsuit to enforce the state's housing laws against the City. In fact, Appellants applied to this Court for an emergency injunction that would do exactly that. *See* Dkt. 17.1.

Thus, the District Court could have, as an alternative grounds for dismissal, chosen not to unnecessarily entangle itself in ongoing state court proceedings and abstained from hearing this case under the *Younger* doctrine. This Court could do the same.

///

///

47

V. **IN THE ALTERNATIVE, THIS ACTION COULD BE DISMISSED FOR FAILURE TO STATE A CLAIM**

As set forth below, even if any of the Appellants had standing, their claims would still fail on the merits. A decision to dismiss for failure to state a claim is reviewed *de novo*. *Wood v. City of San Diego*, 678 F.3d 1075, 1080 (9th Cir. 2012).

### A. The First Amendment Does Not Permit a Local Government Agency to Violate State Housing Laws

#### 1. The City Officials Do Not Have a Protected First Amendment Right in their Legislative Votes

The City is a political subdivision of the state, subject to the state's control and direction, not just with respect to housing requirements, but myriad others. Thus, it cannot use the First Amendment as an excuse to violate state housing and zoning laws. A municipality is a creature of the state and as such is bound to comply with state law, subject only to limits imposed by the *state* constitution. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907).

If a city's elected officials could invoke the First Amendment to avoid their obligations under state housing laws, they could do the same for virtually any law, merely by contending the law forces them to take actions

48

that they "disagree" with. California, or any other state, would instantly become ungovernable.

Recognizing this obvious point, the Supreme Court has held that the First Amendment does not protect a legislator's votes. *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011). In *Carrigan*, the Supreme Court upheld a Nevada statute requiring a legislator's recusal in the event of a conflict of interest. *Id*. at 125. According to the Supreme Court, a legislative vote is an "apportioned share of the legislature's power" to adopt or reject legislation. *Id*. at 125-26. "The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id*. at 126.

By that same logic, requiring local legislative bodies to adopt certain housing policies has no First Amendment implications. Just as an individual "legislator has no right to use official powers for expressive purposes," a local legislative body cannot have a First Amendment interest in the discharge of its official duties. *Id*. at 127. A governmental act does not become "expressive simply because the governmental actor wishes it to be so." *Id*. at 128. The First Amendment, at bottom, does not confer "a right to use governmental mechanics to convey a message." *Id*. at 127.

The City Officials simply do not have a First Amendment right to exercise their votes however they want. And the City Officials do not have the right to use their official powers—here, the ability to approve or reject a housing element and its associated environmental documents—for expressive purposes. *Carrigan*, 564 U.S. at 127; *see also Garcetti*, 547 U.S. at 421. The First Amendment thus *limits* the City Officials' use of their powers. *See, e.g., Freed*, 601 U.S. __, slip op. at 14-15 (holding that a city official's control of a personal but public social media page can constitute state action). It does not *expand* those powers. And California's requirement that city councilmembers vote to periodically update local land use policies in no way implicates their right to speak as individuals. Indeed, the City Officials have repeatedly and at length criticized the State's housing mandates and complained that they do not want to obey them. *See, e.g.*, 3-ER-355 [Declaration of Mayor Tony Strickland] ("I stated on the record that [sic] the March 21, 2023 City Council Meeting, as well as the April 4, 2023 City Council Meeting that I could not in good conscience support…the endorsement of the 13,368 high-density RHNA Units"); 3-ER-316 [Declaration of Mayor Pro Tem Gracey Van Der Mark] (verbatim). They are

50

free to express those criticisms. But the First Amendment cannot absolve them from obeying laws they disagree with.

### 2. The Purported Free Speech Violation Caused by the City's CEQA Obligations Will Not Materialize

The City is correct that CEQA may require a local legislative body to adopt a statement of overriding considerations that explains why it is proceeding with a housing element notwithstanding the disclosure of potential environmental impacts. *See* Cal. Pub. Res. Code § 21081(b). But such a requirement does not implicate the First Amendment for the reasons discussed above—legislators do not have a First Amendment right to use their official powers for expressive purposes. *Carrigan*, 564 U.S. at 127.

Further, CEQA and the Housing Element Law do not require any statement of *agreement* with HCD's positions on housing or the Legislature's findings in the Housing Element Law. Plaintiffs can simply cite the City's legal obligation to comply with the Housing Element Law as the rationale for adopting an updated housing element, notwithstanding any environmental impacts. *See* Cal. Pub. Res. Code § 21081(b). If the city councilmembers do not wish to make statements that "Council Members…support the State's high-density housing quota" and that "State-mandated high-density development is *more important* than protecting the

51

City" from environmental impacts, they could simply choose not to do so. Dkt. 11.1 at p. 62. Indeed, Appellants openly admit that the City *itself* prepared the documents required by CEQA. *See id.* If the City Officials did not believe the statements in their environmental impact report were true, they could have simply chosen to *say something else*.

And even if the City Officials could invoke the First Amendment against the State, they have not suffered any restriction on their "speech." The State merely requires the City to adopt and cyclically update a housing element as part of its general plan. *See* Cal. Gov. Code §§ 65302(c), 65580, *et seq*. Failure to do so has consequences, but those consequences do not punish cities for their *views*, they impose consequences on cities for maintaining *policies* that violate state law. *See, e.g.,* § 65589.5(d)(5). If the City wants to control housing growth, it must do so in a manner consistent with state law, which requires that it meet its fair share of regional housing needs pursuant to clear and objective rules adopted in advance of a proposed new development. *See California Renters Legal Advoc. & Educ. Fund v. City of San Mateo*, 68 Cal.App.5th 820, 850 (2021). The State does not implicate, let alone violate, the First Amendment by preempting how local governments regulate the production of housing.

And if the People and HCD prevail in their state court action, the City will be under a court order to conform its land use policies to state law. *See* Cal. Gov. Code § 65754(a). Although the City may need to conduct environmental review in doing so, it will not need to adopt a statement of overriding considerations as part of that process. *See* Cal. Gov. Code § 65759(a) (exempting from CEQA any action necessary for a local jurisdiction to bring its land use policies into conformity with state law pursuant to a court order). And even if Appellants *were* required to adopt a statement of overriding considerations in order to comply with a court order to conform their land use policies to state law—which they are not—that would still not cause any First Amendment injury, because the statement could simply cite the City's legal obligation to comply with the judgment as an overriding consideration. *See* Cal. Pub. Res. Code § 21081(a)(3), (b); *Tiburon Open Space Comm. v. Cnty. of Marin*, 78 Cal.App.5th 700, 733 (2022); *Sequoyah Hills Homeowners Ass'n v. City of Oakland*, 23 Cal.App.4th 704, 715 (1993).

In sum, the City Officials are free to say whatever they want about state and local housing policies, as they have. The Housing Element Law does not prohibit them from voicing their objections to state law—they may even do

so in their official capacity, in which they enjoy no First Amendment

protection. What they may *not* do is invoke the First Amendment as a shield

against carrying out their obligation to follow the law.

### B. Appellants' Due Process Claims Are Without Merit

### 1. Appellants Have No Procedural Due Process Right to Challenge the State's Housing Laws or RHNA Allocations

Appellants argue their procedural due process rights have been violated

because they were excluded from providing input into the various legislative

and administrative processes that resulted in the City's RHNA allocation,

and because there is no judicial review of HCD's RHNA determination.

Even if the City possessed "due process" rights against the State—and

it does not, as Supreme Court precedent forbids them from bringing such

claims—Appellants' procedural due process claims would fail on the merits.

"A procedural due process claim has two distinct elements: (1) a deprivation

of a constitutionally protected liberty or property interest, and (2) a denial of

adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood

Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). "The base requirement

of the Due Process Clause is that a person deprived of property be given an

opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

*Id.* at 984. "[D]ue process does not always require an adversarial hearing . . .

54

a full evidentiary hearing . . . or a formal hearing[.]" *Buckingham v. Sec'y of U.S. Dep't of Agr.,* 603 F.3d 1073, 1082–83 (9th Cir. 2010) (internal quotations and citations omitted). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation and citation omitted). An analysis of whether due process has been afforded looks to three factors:

> [(1)] the *private* interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*City of Los Angeles v. David,* 538 U.S. 715, 716 (2003) (emphasis added).

Appellants complain that they do not have an opportunity to seek judicial review of their RHNA allocations. 4-ER-657. But there is no "private" interest at stake here, and constitutional due process does not always require judicial intervention. Indeed, as outlined above, Appellants are afforded sufficient process to challenge their regional allocations under statute. *See* Cal. Gov. Code § 65584.05 (providing for an administrative appeal process for member cities and counties to challenge their housing

55

allocations to their respective council of governments). In fact, Huntington Beach *already* pursued an appeal to SCAG during the RHNA allocation process, which was denied. SER-149. Appellants, therefore, have *already been afforded* adequate procedural due process.

### 2. Appellants' Substantive Due Process Claim Fails

#### a. The City Has No Fundamental Constitutional Right to Control Land Use

Appellants' substantive due process claim closely tracks their procedural due process claim and also fails as a matter of law. The Due Process Clause of the Fourteenth Amendment includes a substantive component that protects individual liberties from state interference. *Mullins v. Oregon*, 57 F.3d 789, 793 (9th Cir. 1995). But the range of liberty interests that are protected is narrow, and has largely been confined to deeply personal matters such as marriage, procreation, contraception, family relationships, child rearing, education, and a person's bodily integrity. *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018). Appellants do not and could not allege violation of any such rights. A municipality's control over local zoning is not a liberty interest protected by substantive due process.

At base, Appellants' substantive due process claim (like all of its claims in this case) is rooted in their belief that, as a charter city, Huntington

Beach enjoys unfettered "home rule" authority to control local zoning and permitting decisions. Appellants are incorrect. As California courts have repeatedly explained, the Legislature can permissibly limit a charter city's authority and preempt local law when it deems a subject area to be of "statewide concern," as the Legislature has often done for housing, and as California courts have consistently upheld. *See, e.g. California Renters*, 68 Cal.App.5th at 846-851 (upholding the constitutionality of the Housing Accountability Act against a "home rule" challenge); *Ruegg & Ellsworth v. City of Berkeley*, 63 Cal.App.5th 277, 315 (2021) (upholding the constitutionality of section 65913.4, a streamline permit approval law for multifamily developments, against a "home rule" challenge); *Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.*, 175 Cal.App.3d 289, 306-307 (1985) (upholding the constitutionality of the Housing Element Law against a "home rule" challenge). Appellants do not have a "right" to control local zoning under the California Constitution, much less a *fundamental* right to control local zoning that is protected by the United States Constitution. Simply put, Appellants have no likelihood of success on their substantive due process claim.

///

57

### b.   The State's Housing Laws Easily Pass Rational Basis Review

Even if Appellants could raise a valid constitutional claim (and they do not), they do not allege any circumstances triggering a level of scrutiny beyond rational basis review, which the State's housing laws would easily meet. *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (statute did "not implicate a fundamental right or target a suspect class, so it is subject to rational basis review"). Rational basis review "does not provide 'a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id*. (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993)). The issue is not whether the Legislature has chosen the best means for achieving its purpose, but only whether there are plausible reasons for the Legislature's action. *Id.* And in this case, the Legislature has repeatedly explained its rationale for passing the various housing laws, applying them to charter cities, and requiring cities to adequately zone for new housing via the RHNA process. *See, e.g.* Cal. Gov. Code § 65580 (Legislature's findings with respect to Housing Element Law). The state's housing laws would easily pass rational basis review.

///

58

### C. Appellants' Dormant Commerce Clause Claim is Without Merit

Appellants came nowhere near to stating a viable dormant Commerce Clause claim. Dormant Commerce Clause jurisprudence is primarily "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue v. Davis,* 553 U.S. 328, 337-338 (2008). "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987). A state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce. *See S. Pac. Co. v. State of Ariz.,* 325 U.S. 761, 767, 65 S.Ct. 1515 (1945). And a critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on interstate commerce. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).

Appellants claim that California's housing laws are an attempt to offer "cheaper, more abundant housing than other states," and that the housing laws "forc[e] Plaintiff(s), like other cities in California, to use and divert building supplies and materials from other States" to build additional

59

housing. 4-ER-663. However, Appellants utterly fail to explain how California's housing laws, which require cities to rezone to *allow* the production of housing within California's own borders, directly regulate, discriminate against, or excessively burden interstate commerce. Neither do Appellants explain how California's laws requiring cities to zone for additional housing favor in-state economic interests over out-of-state interests. The housing laws have no requirement, for example, that California cities require homebuilders in their jurisdiction to use exclusively California-manufactured products. Any impact on interstate commerce is clearly indirect and negligible.

### D.   All State Law Claims Should Be Dismissed

In addition to their federal claims, Appellants contend that, *inter alia*, the State's housing laws violate the California Constitution, that the State's housing laws constitute an illegal bill of attainder, that the State is somehow forcing the City to violate CEQA, and that the State defendants have somehow engaged in fraud. 4-ER-663-680. As Appellants' complaint suffers from fatal jurisdictional defects and has not pled any viable federal claims, the District Court would be obliged to dismiss the City's state law claims, even if they could survive the Eleventh Amendment (and they do not).

Where a district court dismisses all federal claims on the merits, it has discretion under 28 U.S.C. § 1367(c)(3) to adjudicate the remaining claims. *Herman Fam. Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001). However, if a court dismisses for lack of subject matter jurisdiction, it has *no* discretion and must dismiss *all* claims. *Id.* As explained above, Appellants do not have standing to pursue federal claims against the State in federal court. Thus, the District Court lacked subject matter jurisdiction over the City's federal claims and was required to dismiss the state law claims. *Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 664 (9th Cir. 2002). And even if Appellants had standing, they have not pleaded any cognizable federal claims on the merits. In these circumstances, the District Court could and should refuse to exercise jurisdiction over state law claims that, as in this action, would predominate over any remaining federal claim. 28 U.S.C. § 1367(c)(2).

The District Court also had discretion to decline jurisdiction over Appellants' declaratory relief claims. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), the exercise of jurisdiction in such cases is committed to the "sound discretion of the federal district courts." *Huth v. Hartford Ins. Co. of the Midwest*, 298 F.3d 800, 802 (9th Cir. 2002)

61

(citations omitted). "Even if the district court has subject matter jurisdiction, it is not required to exercise its authority to hear the case." *Id*. In deciding whether to entertain a declaratory relief action, courts consider how the action would affect the principles of judicial economy, comity, and cooperative federalism that the Declaratory Judgment Act was designed to advance. *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1224 (9th Cir. 1998) (en banc). Three primary factors guide the court's exercise of its discretion: a district court should (1) avoid duplicative litigation, (2) discourage litigants from filing declaratory actions as a means of forum shopping, and (3) avoid needless determination of state law issues. *Huth*, 298 F.3d at 803; *Dizol*, 133 F.3d at 1225. "If there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court." *Dizol*, 133 F.3d at 1225.

These factors strongly weigh against exercising federal jurisdiction in this case. Appellants' action is a transparent attempt to find a friendlier forum for the City's baseless and repeatedly rejected challenges to California's housing laws. Further, Appellants could just as well raise their arguments—however meritless—as defenses in the State's ongoing

enforcement action. Appellants do not need federal declaratory relief, particularly given their specious bases for asserting federal subject matter jurisdiction, and also because the City could always bring itself into compliance with the Housing Element Law by adopting and implementing a compliant housing element. *See* Cal. Gov. Code § 65585(f), (i).

This case ultimately turns on questions of state, not federal, law. Because any legitimate federal questions that may arise can be litigated in state court at the appropriate time, this Court should decline to exercise jurisdiction over the entire case.

## **CONCLUSION**

California has 58 counties, 121 charter cities, 361 general-law cities, and countless school districts, water districts, sanitation districts, and special districts of every type. These are all political subdivisions of the state of California. They sometimes disagree, even vehemently, with the State's laws and policies. This case itself is proof of that.

Were these political subdivisions or officers thereof granted standing to bring constitutional claims in federal court, the state would become ungovernable, as matters of purely intrastate governmental relations would become the business of federal courts. Federal courts, at the expense of state

courts, would be drawn into disputes over every detail of the state's governance of its subordinate units of government. And the principles of federalism would become a dead letter.

The Supreme Court wisely decided not to open this Pandora's Box when it decided *Hunter v. Pittsburgh* over a century ago. This Court heeded its wisdom in *South Lake Tahoe* and has consistently maintained that rule since. Appellants in this action provide *no* justification, much less a compelling one, to discard that rule now. And this is especially so here, where the District Court could have just as easily dismissed the entire action for failure to state a claim, or abstained from hearing the case at all.

If this Court adopts Appellants' arguments, then municipal corporations, by merely adopting a city charter, could invoke the rights afforded to private entities in order to abuse the powers afforded to public entities. The U.S. Constitution does not vest Huntington Beach, or any political subdivision of any state, with this extraordinary status.

The State respectfully requests this Court affirm the District Court's ruling in all respects. In the alternative, the State urges this Court to affirm the dismissal under *Younger* abstention or for Appellants' failure to state any cognizable federal claims.

Dated:  April 3, 2024          Respectfully submitted,


ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DAVID PAI
Supervising Deputy Attorney General

/s/ Thomas P. Kinzinger

THOMAS KINZINGER
Deputy Attorney General
*Attorneys for Defendants and Appellees*
*Gavin Newsom, the California Department*
*of Housing and Community Development,*
*and Gustavo Velasquez*

SA2023306193
Answering Brief of State Appellees (003).docx

## STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 8:23-CV-00421-FWS-ADSx

The undersigned attorney or self-represented party states the following:

[X ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** __/s/ Thomas P. Kinzinger__ .     **Date:** April 3, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                    *New 12/01/18*]

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS FOR
## THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs** *Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-3694

I am the attorney or self-represented party.

**This brief contains 10,454 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32- 2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ Thomas P. Kinzinger___. **Date:** April 3, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

67