No. 23-3694

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

––––––––––––––––

CITY OF HUNTINGTON BEACH, et al.,
*Plaintiffs and Appellants,*

v.

GAVIN NEWSOM, et al.,
*Defendants and Appellees,*

––––––––––––––––

On Appeal from the District Court for the
Central District of California
No. 8:23-cv-00421
Hon. Fred W. Slaughter

––––––––––––––––

**APPELLANTS' REPLY BRIEF**

––––––––––––––––

Michael E. Gates, No. 258446
Nadin S. Said, No. 309802
City of Huntington Beach
City Attorney's Office
2000 Main Street
Huntington Beach, CA
Phone: (714) 536-5555
Fax: (714) 374-1590
Email: michael.gates@surfcity-hb.org

*Attorneys for Plaintiffs and Appellants City of Huntington
Beach, Huntington Beach City Council, Mayor of Huntington
Beach, Tony Strickland, and Mayor Pro Tem of Huntington
Beach, Gracey Van Der Mark*

1

# TABLE OF CONTENTS

Page

Table of Contents ....................................................2

Table of Authorities................................................3

I.    Introduction................................................8

II.   The status of Charter Cities under the California
      Constitution is a question state law, not federal law..11

III.  State appellate authorities in *Redondo Beach* and
      *Haytasingh* confirm, resoundingly, that charter cities
      are *not* political subdivisions. ......................19

IV.   To the extent *Burbank*'s cursory analysis announced a
      categorical rule, it was unnecessary dicta.................24

V.    Abstention, disfavored in First Amendment claims, is
      not appropriate because the relief sought here would
      not interfere with the state judicial process...............26

VI.   Defendants do not meaningfully dispute that Plaintiffs
      are subject to compelled speech. ..................30

      A.   A vote, coupled with a compelled content-specific
           statement of explanation, amounts to compelled
           speech. ........................................30

      B.   Plaintiffs may not issue a sham statement, as the
           State urges. ................................31

      C.   Penalizing Plaintiffs for failing to engage in speech
           is compelled speech. ..................................34

      D.   Subjecting Plaintiffs to litigation for failing to
           engage in speech is compelled speech........................35

VII.  While reversal does not require revisiting *South Lake
      Tahoe*, its holding is not as broad as Defendants argue.
      ....................................................36

VIII. Conclusion ................................................39

Certificate of Compliance....................................40

Certificate of Service ...........................................41

# TABLE OF AUTHORITIES

Page(s)

## US SUPREME COURT CASES

*Baggett v. Bullitt,*
377 U.S. 360 (1964) ........................................................29

*Board of Education v. Allen,*
392 U.S. 236 (1968) ........................................................37

*Christian Legal Soc. Chapter of the Univ. of California,*
*Hastings Coll. of the Law v. Martinez,*
561 U.S. 661 (2010) ........................................................29

*Deakins v. Monaghan,*
484 U.S. 193 (1988) ........................................................28

*Dunn v. Blumstein,*
405 U.S. 330 (1972) ........................................................34

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960) ...........................................18, 35, 37

*Harman v. Forssenius,*
380 U.S. 528 (1965) ........................................................34

*Hawaii Housing Auth. v. Midkiff,*
467 U.S. 229 (1984) ........................................................28

*Huffman v. Pursue, Ltd.,*
420 U.S. 592 (1975) ........................................................29

*Hunter v. City of Pittsburgh,*
207 U.S. 161 (1907) .................................................18, 22

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................38

3

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ...................................................................28

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) .........................................................30, 31

*New Orleans Pub. Serv. Inc. v. Council of the City of New
    Orleans*,
    491 U.S. 350 (1989) .......................................................27, 28

*Regents of the Univ. of Cal. v. Doe*,
    519 U.S. 425 (1997) ....................................................9, 11, 13

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ...............................................................14

*Trenton v. New Jersey*,
    262 U.S. 182 (1923) .........................................................22, 23

*Williams v. Mayor*,
    289 U.S. 36 (1933) .................................................................23

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) .........................................................14, 15

*Zwickler v. Koota*,
    389 U.S. 241 (1967) ...............................................................29

**FEDERAL CASES**

*Benavidez v. Eu*,
    34 F.3d 825 (9th Cir. 1994) ...................................................28

*Burbank-Glendale-Pasadena Airport v. Burbank*,
    136 F.3d 1360 (9th Cir. 1998) ...........................................8, 14

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
    782 F.3d 520 (9th Cir. 2015) .................................................28

*City of San Juan Capistrano v. California Pub. Utilities Comm'n,*
    937 F.3d 1278 (9th Cir. 2019) ....................................24, 38

*City of South Lake Tahoe v. California Tahoe,*
    625 F.2d 231 (9th Cir. 1980) .................................................8

*Courthouse News Serv. v. Planet,*
    750 F.3d 776 (2014) ............................................................28

*Douglas v. Noelle,*
    567 F.3d 1103 (9th Cir. 2009) ............................................29

*Gilbertson v. Albright,*
    381 F.3d 965 (9th Cir. 2004) .......................................26, 28

*Green v. City of Tucson,*
    255 F.3d 1086 (9th Cir. 2001) ....................................26, 27

*Omnipoint Communs. v. City of Huntington Beach,*
    738 F.3d 192 (9th Cir. 2013) ..............................................10

*Palomar Pomerado Health Sys. v. Belshe,*
    180 F.3d 1104 (9th Cir. 1999) .....................................17, 37

*Rogers v. Brockette,*
    588 F.2d 1057 (5th Cir. 1979) ...............................18, 22, 37

*San Diego Unified Port Dist. v. Gianturco,*
    651 F.2d 1309 (9th Cir. 1981) ............................................36

*Sorosky v. Burroughs Corp.,*
    826 F.2d 794 (9th Cir. 1987) ..............................................29

*Thomas v. Mundell,*
    572 F.3d 756 (9th Cir. 2009) ..............................................38

*United States v. McAdory,*
    935 F.3d 838 (9th Cir. 2019) ..............................................26

## STATE CASES

*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.*,
91 Cal. App. 4th 1344 (2001) .............................................32

*Birkenfeld v. City of Berkeley*,
49 Cal. App. 3d 464 (1975) ...................................15

*Board of Supervisors v. McMahon*,
219 Cal. App. 3d 286 (1990) .................................23

*City of Burbank v. Burbank-Glendale-Pasadena Airport Auth.*,
72 Cal. App. 4th 366 (1999) .................................21

*City of Redondo Beach v. Padilla*,
46 Cal. App. 5th 902 (2020) .................................14

*County of San Mateo v. Coburn*,
130 Cal. 631 (1900)...........................................16

*Fragley v. Phelan*,
126 Cal. 383 (1899)...........................................16

*Haytasingh v. City of San Diego*,
66 Cal. App. 5th 429 (2021) ......................13, 14, 19, 20, 21

*Johnson v. Bradley*,
4 Cal.4th 389 (1992) .........................................15

*Miller v. City of Sacramento*,
66 Cal. App. 3d 863 (1977)...................................17

*Otis v. City of Los Angeles*,
52 Cal. App. 2d 605 (1942)...................................20

*People v. Hoge*,
55 Cal. 612 (1880)............................................15

*Save Our Neighborhood Grp. v. City of Lancaster*,
No. B225087, 2011 Cal. App. Unpub. LEXIS 4612 (2011) 32

*Sequoyah Hills Homeowners Ass'n v. City of Oakland*,
23 Cal. App. 4th 704 (1993) .........................................33, 34

*Star-Kist Foods, Inc. v. County of Los Angeles*,
42 Cal. 3d 1 (1986)....................................................8, 21, 22

*State Building & Construction Trades Council of California v. City of Vista*,
54 Cal. 4th 547 (2012) .......................................................15

*Tiburon Open Space Comm. v. Cnty. of Marin*,
78 Cal. App. 5th 700 (2022) .........................................32, 33

*Wilson v. Beville*,
47 Cal. 2d 852; 306 P.2d 789 (Wilson v. Beville (1957).....22

## STATE CONSTITUTIONAL PROVISIONS

California Article XI § 1................................................................16

## STATUTES

Cal. Gov. Code § 34450 .......................................................16, 17

Cal. Gov. Code § 34458 .............................................................17

Cal. Gov. Code § 65585 .............................................................36

Cal. Gov. Code § 65754 ..................................................10, 27, 35

Cal. Gov. Code § 65759 .......................................................10, 35

Cal. Pub. Res. Code § 21081 .....................................................31

## FEDERAL RULES

Federal Rules of Appellate Procedure Rule 32 .........................40

## I.    INTRODUCTION

According to the State,[1] once individual plaintiffs take office as Mayor and Mayor Pro Tem, the doors of the federal courts are closed to their federal claims against the State. This is wrong.

The State's core argument is that the relationship between California Charter Cities and other state authorities is determined by looking to federal law. (Newsom Br. 28-29; SCAG Br. 21.) The State argues that the panel in *Burbank-Glendale-Pasadena Airport v. Burbank*, 136 F.3d 1360 (9th Cir. 1998) answered that question of the State's internal political organization by considering exclusively "the *federal* Constitution." (Newsom Br. 29.)

Nothing about the State's argument is right. The very principle underlying the no-standing rule is that "the Constitution does not interfere with a state's internal political organization." *Star-Kist Foods, Inc. v. County of Los Angeles* 42 Cal. 3d 1, 8 (1986) (discussing federal authorities). The State's argument turns the no-standing rule on its head and posits its contrary—namely, that *City of South Lake Tahoe v. California Tahoe*, 625 F.2d 231 (9th Cir.

---

[1] The defendants in this case include various state officials and agencies in their official capacity, including the Governor and the Director of the Department of Housing and Community Development. A central issue in this appeal concerns what constitutes the "State," and what constitutes a "political subdivision" of the State. Any reference to the defendants as the "State" should not be considered a concession on this issue.

1980) and *Burbank* stand for the principle that the Constitution *dictates* a state's internal political organization.

While the nature of a state's internal political organization sometimes factors in a federal question—such as sovereign immunity, or here, standing—"that federal question can be answered only after considering the provisions of *state* law that define the agency's character." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-430 (1997) (italics added).

The State is also wrong on *Burbank*. If the State were correct, one would expect to see *Burbank* analyze whether the Charter City there was a "political subdivision" by looking to federal authorities. But that's not what happened: on this point, *Burbank* discussed not a single federal authority. *Burbank* did not decide the character of a Charter City as a "political subdivision," as that was not the question before the Court. Instead, *Burbank* merely accepted that reference, appearing in the Public Utilities Code, without scrutiny. Beyond that brief discussion in the *Burbank* opinion, no discussion of federal law may be found. Nor did *Burbank* reach for authorities discussing constitutional principles. Instead, *Burbank* cited just two statutes—*state* statutes—in a subdivision of the Public Utilities Code specific to municipal airports, the subject matter at issue in that case.

In short, the *Burbank* panel would not have expected litigants to construe its citation to a municipal airport statute as establishing, as a binding rule of this Circuit, the structure of states' internal political organization.

As to its effort to compel speech, the State never seriously responded below, and does not respond now on appeal. The State cites cases to the effect that casting a vote is not protected speech. (Newsom Br. 51.) But Plaintiffs' challenge focuses on the State's requirement that they "publicly declare that the City and the State needs more high-density housing, and that the benefits of high-density development in the City outweigh the development's negative impacts on the environment. (4-ER-627—28.)" (OB 29.) The State does not dispute that this is compelled speech.

Attempting to justify its actions, the State seeks refuge in state zoning laws, specifically California Government Code sections 65754 and 65759. (Newsom Br. 53.) But state law also confirms that these sections do not apply to Charter Cities, as this Court has observed: "charter cities are . . . exempt from many of the state local planning and zoning regulations provisions," citing specifically section 65700, which states that the entire chapter—including section 65754 and 65759—"shall not apply to a charter city." *Omnipoint Communs. v. City of Huntington Beach*, 738 F.3d 192, 196-197 (9th Cir. 2013).

Finally, the State urges this Court to rule that *Younger* abstention applies to this free-speech case. But as this Court has warned, *Younger* abstention does not apply where the federal relief would not interfere in the state action. And the State does not identify any potential interference. To the contrary, the State argues that it intends to ask the state court to enact a housing element without adopting a statement of overriding considerations, irrespective of any free-speech violation. (Newsom Br. 53.) In this, the State tacitly acknowledges that Plaintiffs are not seeking any relief that would interfere with the state court action.

The State advances no arguments that remotely justify its compelled-speech regime.

## II. The status of Charter Cities under the California Constitution is a question state law, not federal law.

The ultimate conclusion whether a state agency has standing in federal court is a federal question. But that ultimate question depends on the legal character of the agency under state law. *Regents*, 519 U.S. at 429-430. The State is wrong when it argues that "the California state constitution is irrelevant." (Newsom Br. 28-29.)

In *Regents*, the University of California operated a laboratory under contract with the federal government. *Id.* at 426-27. A physicist at that laboratory sued the university for breach of a hiring agreement. The university raised

sovereign immunity, prompting the question whether the university was an arm of the state. *Id.* at 427. This Court held it was not, focusing on the terms of the indemnity agreement between the university and the Department of Energy, which made the state liable. *Id.*

Reversing, the Supreme Court instructed that, to determine whether a state agency is an arm of the state, "our cases have inquired into the relationship between the State and the entity in question." *Id.* at 429. This inquiry includes "focus[ing] on the 'nature of the entity created by state law'[5] to determine whether it should 'be treated as an arm of the state.'" *Id.* at 429-30 (citation omitted).

The instruction most relevant to this appeal is at footnote 5: "Ultimately, of course," said the Court, whether an agency is an arm of the state for purposes of Eleventh Amendment sovereign immunity "is a question of federal law. But that federal question can be answered only after considering the provisions of state law that define the agency's character." *Id.* at 430, n. 5.

Beyond deciding the specific sovereign-immunity issue before it, however, the Court declined to make a broader holding about the relationships between states and their agencies: "Nor is it necessary to decide whether there may be some state instrumentalities that qualify as 'arms of the State' for some purposes but not others." *Id.* at 428 n.2. So

the State is wrong to suggest that there is some all-purpose federal rule defining the relationships between states and their various agencies and offices.

Instead, answering whether a Charter City is a "political subdivision" requires some consideration of what a "political subdivision" is. The phrase, after all, is not self-defining. While *South Lake Tahoe* set out a purportedly per se rule concerning "political subdivision," that panel never actually defined the term.

SCAG argues that "political subdivision" is defined by looking to federal law, and that state authorities—specifically, *Haytasingh* and *Redondo Beach*—are inapplicable. (SCAG Br. 21.) But as discussed above, SCAG is incorrect. *Regents*, 519 U.S. at 429 n. 5. SCAG does not cite authority or explain what it means. SCAG simply states, ipse dixit, that "[t]he pertinent issue is whether Huntington Beach is a 'political subdivision' of the state under federal jurisprudence governing Article III standing, not state statutes regarding matters such as the regulation of state naval vessels or the synchronization of state election cycles." (SCAG Br. 21.) There is an irony in SCAG's derisive characterization of *Haytasingh* and *Redondo Beach*, which wrongly suggests that those courts limited their definitions of "political subdivision" to the context of specific state statutes. In fact, this was the approach taken by the *Burbank* decision, tailoring its definition of "political

subdivision" to a municipal airport statute. *Burbank*, 136 F.3d at 1364. *Haytasingh* and *Redondo Beach*, to the contrary, defined "political subdivision" by looking to the California Constitution and decisions of the Supreme Court of California, filling several pages with treatment on the subject. *Haytasingh v. City of San Diego*, 66 Cal. App. 5th 429, 458-61 (2021); *City of Redondo Beach v. Padilla*, 46 Cal. App. 5th 902, 910-11, 913-14 (2020)

The State cites *Reynolds v. Sims*, 377 U.S. 533, 575, (1964), which refers to "political subdivisions" as "counties, cities, or whatever"—not exactly a robust list. But in that gerrymandering case, the Court was not discussing standing, or Charter Cities, but rather rejecting Alabama's comparison of its unconstitutional legislative apportionment regime to that of the U.S. Congress.

More helpfully, however, the Court went on to explain that political subdivisions are not "sovereign entities"; instead, they are "'subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.'" *Id.* at 575. The Supreme Court explained the crucial feature of "political subdivisions," as compared to private corporations, in *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009): As a corporation is created by private citizens, "a corporation 'enjoys constitutional protections,'" whereas a political subdivision, created or terminated at the pleasure of the

14

state, "'has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" *Id.* at 362-63 (internal quotations omitted).

Plaintiffs agree. Political subdivisions are characterized by being subordinate to some other state authority, as the subdivision executes functions belonging to that higher authority. And this is what distinguishes Charter Cities: Charter Cities do not execute functions belonging to any higher authority. Instead, a Charter City executes functions that the state constitution assigns to them directly. *Birkenfeld v. City of Berkeley*, 49 Cal. App. 3d 464, 464 (1975) ("As to municipal affairs, a charter city has the power, within the limits of its charter and the state Constitution, to govern without interference from the state.") The Legislature has no discretion to invade a Charter City's home rule except when the statute reasonably relates to a statewide concern and is narrowly tailored against interfering with local governance. *State Building & Construction Trades Council of California v. City of Vista*, 54 Cal. 4th 547, 555 (2012).

In its brief, the City summarized the history of charter cities under the California Constitution. (AOB 48-50.) Most notably, Californians created charter cities "to emancipate municipal governments from . . . the Legislature," *Johnson v. Bradley*, 4 Cal.4th 389, 395 (1992), quoting *People v. Hoge*, 55 Cal. 612, 618 (1880), and these provisions were later

strengthened to prevent charter cities' authority "from being frittered away by general laws" and "to enable municipalities to conduct their own business and control their own affairs." *Fragley v. Phelan*, 126 Cal. 383, 387 (1899).

A Charter City, then, is created—not by the state—but by the people, acting in their residual, discretionary power to govern their communities. Cal. Gov. Code §§ 34450 et seq. (formation of charter cities); § 34451 (charter to be proposed by commission chosen by voters of the city); § 34457 (charter to be approved by the voters). This exercise by the people— not by the state—is of a power neither shared with nor derived from other state authorities. That power is, as the Supreme Court of California characterized it, "emancipate[d]" from the state, so that it cannot be "frittered away" by the state. *Fragley*, 126 Cal. at 387.

The legal form taken by the Charter City here is a Municipal Corporation. The State notes that some municipal corporations are political subdivisions, which exist by virtue of the exercise of the power of the state, and thus the legislature could at any time terminate them and provide other and different means for the government of the district comprised within the limits of the former city. *County of San Mateo v. Coburn*, 130 Cal. 631 (1900), Cal Const, Art. XI § 1. But the Legislature cannot create a Charter City—only the people can. Cal. Gov. Code §§ 34450 et seq. And the Legislature cannot terminate a Charter City—it can be

dissolved only by the people. *See* Cal. Gov. Code §§ 34450, 34458; *Miller v. City of Sacramento* 66 Cal. App. 3d 863, 867 (1977) (a charter city is subject only to its own charter and the California Constitution). That should be dispositive: a Charter City created by the discretion of the people, and continuing its existence at their pleasure, cannot be deemed a "political subdivision" of some other authority.

By way of juxtaposition, SCAG cites the helpful case of *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999). Applying the rule in *South Lake Tahoe*, the panel in *Palomar Pomerado* embarked by stating "[w]e must determine . . . whether Palomar Pomerado is a 'political subdivision' of the State of California . . . ." *Id.* at 1107. The panel then considered the fact that the plaintiff health-care district was formed under California statute, and the fact that "[i]ts powers are limited to those granted to it by" those statutes. *Id.* The panel went on to enumerate the powers and functions of the health-care district, all of which were legislatively vested via statute. "As such, it is a 'political subdivision' and an agency of the state." *Id.*

By contrast, a Charter City is formed by the authority of the state Constitution—not its Legislature. And a Charter City exercises the powers and functions defined by the Constitution—not by the Legislature.

The State also repeatedly cites the U.S. Supreme Court decision *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907), for the proposition that "Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be [e]ntrusted to them." (Newsom Br. 15, 30.) But *Hunter* did not involve a Charter City (Pittsburgh was a general-law city at the time), and the subject matter— tax-collection—is not within the constitutional ambit of a California Charter City. And *Hunter* confirmed that a federal court will "have nothing to do with the interpretation of the Constitution of the state and the conformity of the enactment of the assembly to that Constitution." *Hunter*, 207 U.S. at 176.

Besides, as the Supreme Court later observed about *Hunter*, "a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases." *Gomillion v. Lightfoot*, 364 U.S. 339, 344, (1960). *See also Rogers v. Brockette*, 588 F.2d 1057, 1068 (5th Cir. 1979) ("[W]e do not think [*Hunter* and its progeny] hold that a municipality

never has standing to sue the state of which it is a creature.")

In short, the State is wrong that what constitutes a "political subdivision" in California is defined solely by federal authority. As the *Burbank* panel did, the Court should turn to applicable California law.

## III. State appellate authorities in *Redondo Beach* and *Haytasingh* confirm, resoundingly, that charter cities are *not* political subdivisions.

The State argues that *Redondo Beach* and *Haytasingh* did not establish that charter cities are not political subdivisions. (Newsom Br. 34.) Instead, the State argues that these cases merely confirm that the Legislature generally specifies whether the term "political subdivision" includes Charter Cities for purposes of particular state statutes. (Newsom Br. 34.) SCAG argues to similar effect, concluding that the state court decisions apply the term "political subdivision" to Charter Cities on a case-by-case basis, but only federal cases are relevant, and those cases, say SCAG, apply a categorical rule. (SCAG Br. 21-22.)

But Defendants do not address the argument posed in Plaintiff's brief, namely: Why, then, did *Burbank* analyze the nature of a "political subdivision" by relying on state law?

The answer, as *Haytasingh* confirms, is that the question is ultimately judicial, not categorical: "Although the

City may be considered a 'subdivision' of the state in certain conceptual, geographic or political senses, it is not necessarily so for all purposes." *Haytasingh*, 66 Cal. App. 5th at 458. *Haytasingh* continued: "Notably, the California Constitution does not refer to or identify cities or municipal corporations as 'legal subdivisions of this state.' Thus, courts have noted that a county is considered a legal subdivision of the state *for various purposes*." *Id.* (italics added). Rather than make a categorical statement, the court added the qualifying phrase, "for various purposes," to emphasize that it is the purpose and circumstances that determine whether an entity is acting in the capacity of a subdivision of the sovereign.

Here, the City is not acting as a subdivision of the State. It is acting instead as one of the constitutional entities created by "the free consent of the persons composing them." *Otis v. City of Los Angeles* (1942) 52 Cal. App. 2d 605. And as *Haytasingh* observed, "California, alone, has the power to determine how to define a municipal corporation and confer on it whatever powers it sees fit." *Haytasingh*, 66 Cal. App. 5th at 462. And when the Supreme Court in *Hunter v. City of Pittsburgh* referenced "political subdivision," it did so "as a descriptor of the function and derivation of municipal corporations, *not as a legal definition for all purposes*." *Haytasingh*, 66 Cal. App. 5th at 462 (italics added). The court emphasized that there was no basis "to

conclude that a city is a legal subdivision of the state *for all purposes.*" *Id.* (italics added).

SCAG cites a state court case, *City of Burbank v. Burbank-Glendale-Pasadena Airport Auth.*, 72 Cal. App. 4th 366, 380 (1999), a parallel action to the *Burbank* case, which also held that "the Authority has no standing to challenge the validity of a state statute under the Fourteenth Amendment of the Federal Constitution." (SCAG Br. 18.) But the state court *Burbank* case does not stand for the rule that a political subdivision may not sue the state. Instead, it cites a slightly different rule, citing *Star-Kist Foods, Inc. v. County of Los Angeles*, 42 Cal. 3d 1, 6, 8 (1986). The Supreme Court of California in *Star-Kist* held that political subdivisions *may* bring constitutional challenges against a state law. Notably, there is no analysis concerning Charter Cities. Considering the "no standing" rule, the Court noted that the contours of the rule had not been fleshed out. Looking to *South Lake Tahoe*, the Court came away disappointed, stating that, "[r]egrettably, the *South Lake Tahoe* decision provides little guidance as to the court's reasoning in choosing a per se rule." *Star-Kist Foods*, 42 Cal. 3d at 7. Instead of furnishing reasons, *South Lake Tahoe* "simply concluded" its per se rule into existence. *Id.* The Court also noted several cases that departed from the per se rule and found standing to bring supremacy clause challenges. *Id.* at 7-8.

The Court next looked to the historical basis of the no-standing rule provided in *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), cert. den., 444 U.S. 827, which concluded that the rule generally had been applied to deny standing when the State had altered a subdivision's boundaries, such as in *Hunter v. Pittsburgh*, 207 U.S. 161 (1907), or when the state modified a subdivision's benefit, such as in *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). The *Star-Kist* Court went on to note *Rogers*' observation that the no-standing rule flows from the "principle that the Constitution does not interfere with a state's internal political organization." *Star-Kist Foods*, 42 Cal. 3d at 8, quoting *Rogers*, 588 F.2d at 1070. So it would be surprising if a rule deriving from a principle of non-interference in state affairs were to dictate that a Charter City formed under the California Constitution must be, contrary to that Constitution, a "political subdivision." The *Star-Kist* Court went on to find standing to assert a Commerce Clause challenge. *Star-Kist Foods*, 42 Cal. 3d at 8-10.

The only reference to Charter Cities in *Star-Kist* is this: "Though municipalities may enjoy a greater degree of autonomy with regard to local affairs (*Wilson v. Beville* (1957) 47 Cal. 2d 852, 858-859, 306 P.2d 789 [charter cities]), they too are subject to the sovereign's right to extend, withdraw or modify the powers delegated," citing *Trenton v. New Jersey*, 262 U.S. at 187. *Star-Kist*, 42 Cal. 3d at 6. But

the organization of state power in *Trenton* was much different than in California. *Trenton* stated that, generally, "municipalities have no inherent right of self-government which is beyond the legislative control of the state." *Trenton*, 262 U.S. at 187. But this observation comes with the noteworthy qualification that it applies only "[i]n the absence of state constitutional provisions safeguarding [rights of self-government] to them." *Id.* Such state constitutional safeguards are explicitly afforded to Charter Cities in California.

The state court *Burbank* decision also cited *Williams v. Mayor*, 289 U.S. 36, 40 (1933), which held: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under which it may invoke in opposition to the will of its creator." The state in that case had exempted a railroad from taxation, which would impact the city's tax receipts. There is no question in this case of the state's power to tax, only its power to carry out its housing-density regime, including by compelled speech.

The state court *Burbank* decision also cited *Board of Supervisors v. McMahon*, 219 Cal. App. 3d 286, 296-297 (1990), which stated: "The same reasoning applies to the due process protections afforded under the California Constitution." But the standing analysis does not reach charter cities.

In sum, California authorities resoundingly reject the State's premise that Charter Cities are "political subdivisions" of the State.

## IV. To the extent *Burbank*'s cursory analysis announced a categorical rule, it was unnecessary dicta.

The State does not dispute that *Burbank*'s conclusion concerning charter cities was not supported by analysis. Instead, the State argues that, despite its lack of support, *Burbank*'s rule has been followed by other published cases. The State cites *City of San Juan Capistrano v. California Pub. Utilities Comm'n*, 937 F.3d 1278, 1281 (9th Cir. 2019), as support that *Burbank* has been followed by multiple other panels. (Newsom Br. 32.)

Not quite. *San Juan Capistrano* noted the precedential status of *South Lake Tahoe*, noting other cases following that rule, including *Burbank*. *San Juan Capistrano*, 937 F.3d at 1281. But that comment on the precedential value of the *South Lake Tahoe* holding on "political subdivisions" is not a comment on the precedential value of *Burbank*'s holding concerning charter cities.

Besides, Plaintiffs are not challenging the approach in *Burbank*. Instead, Plaintiffs contend that *Burbank*'s holding—that the Charter City there was a political subdivision—was *not* categorical, but instead was based on

the circumstances of that case. And Plaintiffs contend that this Court should follow *Burbank*'s approach here by looking to applicable California law, as *Burbank* did. Doing so here leads to the conclusion that Huntington Beach is not a political subdivision.

But to the extent that *Burbank* suggested, categorically, that Charter Cities are "political subdivisions," that suggestion was dicta. The State does not meaningfully dispute this, and merely recites background principles followed by its conclusion that this categorical suggestion is binding precedent. (Newsom Br. 33.) SCAG argues that *Burbank*'s holding—that "charter cities in California generally are defined as political subdivisions along with other governmental entities"—was a central issue, and thus not dicta, because without it the court could not have applied *South Lake Tahoe*. (SCAG Br. 17-18.)

SCAG misinterprets Plaintiffs' argument. Plaintiffs acknowledge that *Burbank* held that the tri-city agency was a political subdivision, and that *that* holding was necessary to decide the case. But it was unnecessary for the court to reach any "broader proposition that Charter Cities generally may be treated as 'political subdivisions' of the State." (AOB 58.) To the extent *Burbank* did suggest that broader proposition, it "was both cursory and unnecessary" to the issues, and thus dicta. (AOB 58.) And as *Burbank* supplied no reasoning for such a broader proposition, it is not binding.

25

*United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (citations and alterations omitted). (AOB 58-59.)

The State does not respond to that argument.

## V. Abstention, disfavored in First Amendment claims, is not appropriate because the relief sought here would not interfere with the state judicial process.

The State urges this Court to rule, in the first instance, that Plaintiffs' complaint should be dismissed on abstention grounds. (Newsom Br. 44.) But the State does not contend that the remedy sought in this case—including declaring the compelled-speech regime unconstitutional—would interfere with the state court proceeding. And it would not, as the State itself concedes.

In *Green v. City of Tucson*, 255 F.3d 1086, 1094 (9th Cir. 2001), this Court held that *Younger* abstention "applies only when there is an additional element absent here: that the federal relief would interfere in some manner in the state court litigation." This Court later broadened *Green*'s definition of what constitutes interference in *Gilbertson v. Albright*, 381 F.3d 965, 975 (9th Cir. 2004), holding that interference may exist where the practical effect of the federal remedy, such as declaratory relief, operates to enjoin the state court proceeding. *Id.* at 975. *Gilbertson* also held that interference would no longer be required as a threshold element of *Younger* abstention. *Id.* at 978.

But as the State concedes, no interference is threatened here. The State argues that, once the state court orders the City to conform its housing policies to state law (Cal. Gov. Code § 65754(a)), the City "will not need to adopt a statement of overriding considerations." (Newsom Br. 53.) In other words, regardless of the remedy the district court might award, the State intends to pursue the same theory in the state court action. The outcome in this case, according to the State, will not matter one way or the other.

While Plaintiffs disagree with their theory, the State is free to pursue it in state court. But no remedy sought in this action interferes with it, and so nothing in the abstention doctrines prevents Plaintiffs from vindicating their First Amendment rights in federal court—including their right not to have to "violat[e] state law" just to avoid compelled speech. (2-ER-159; 3-ER-530.) As in *Green*, 255 F.3d at 1098, Plaintiffs "are doing nothing more than challenging the constitutionality of a state statute, that is, 'challeng[ing] completed legislative action.'" (Citing *New Orleans Pub. Serv. Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 372 (1989) (*NOPSI*).) And again, regardless of the outcome on that question, the State will press on with its objective to have the state court order Plaintiffs to adopt a housing element.

Abstention doctrines are even more circumscribed concerning First Amendment claims. This Court has

acknowledged that the Supreme Court has repeatedly instructed that the circumstances supporting abstention are "carefully defined" and "remain 'the exception, not the rule.'" *NOPSI*, 491 U.S. at 491 (quoting *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)); *Gilbertson*, 381 F.3d at 969 n.2 ("We do not, however, retreat from *Green*'s more general observation that . . . abstention . . . remain[s] the exception, not the rule." (Internal quotation marks omitted)). As a general matter, "the federal courts' obligation to adjudicate claims within their jurisdiction [is] 'virtually unflagging.'" *Id.* (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)). Abstention is disfavored in First Amendment cases due to the risk that the resulting delay may chill the exercise of protected rights. *Courthouse News Serv. v. Planet*, 750 F.3d 776 (2014); *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015).

Even in the absence of First Amendment concerns, the Supreme Court has cautioned that abstention doctrines are to be deployed with circumspection. Courts are "not to find some substantial reason for the exercise of federal jurisdiction" but rather to determine if "exceptional" circumstances exist to justify surrender of jurisdiction. *Benavidez v. Eu*, 34 F.3d 825, 831 (9th Cir. 1994) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983)). Abstention also is not proper "simply to

give state courts the first opportunity to vindicate the federal claim." *Zwickler v. Koota*, 389 U.S. 241, 251 (1967). The "abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964).

Here, the district court did not address abstention. Had it done so, there might have been a more complete record on another exception to *Younger* abstention, namely, that abstention does not apply "where the challenged statute is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 610 (1975). The State's compelled-speech regime here, while subtle, is undeniable, such that the State does not even meaningfully dispute it. That exception should apply here. Where "a full analysis by the district court may assist" appellate review, *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 802 (9th Cir. 1987), the reviewing court may "remand to the district court for consideration" of the argument "in the first instance," *Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir. 2009). *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 698 n.28 (2010) ("When the lower courts have failed to

address an argument that deserved their attention, our usual practice is to remand for further consideration, not to seize the opportunity to decide the question ourselves").

## VI. Defendants do not meaningfully dispute that Plaintiffs are subject to compelled speech.

### A. A vote, coupled with a compelled content-specific statement of explanation, amounts to compelled speech.

Addressing the compelled-speech issue, the State acknowledges that Plaintiffs must make a statement of overriding considerations. (Newsom Br. 51.) But the State denies that there is a free-speech issue because "legislators do not have a First Amendment right to use their official powers for expressive purposes," citing *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011). (Newsom Br. 51.)

But as *Carrigan* explains, the reason voting ordinarily is not protected speech is that it is not "an act of communication," and that is because there is no reason to believe the legislator's vote actually communicates a personal preference—for example, the vote might just be good politics, though being personally anathema to the one casting it. *Carrigan*, 564 U.S. at 126-127.

That is why the statement here is different: Plaintiffs are being made to state the *reasons* they are approving the

project. The statement and vote are no longer a mere vote, but a compelled "act of communication." *Id.*

## B. Plaintiffs may not issue a sham statement, as the State urges.

The State argues that, even though the councilmembers must make the statement, the CEQA and Housing Element Laws "do not require any statement of *agreement* with" the high-density policies. (Newsom Br. 51.) Instead, "Plaintiffs can simply cite the City's legal obligation to comply with the Housing Element Law as the rationale for adopting an updating housing element, notwithstanding any environmental impacts. *See* Cal. Pub. Res. Code § 21081(b)." (Newsom Br. 51.) So if the Plaintiffs "did not believe the statements" in the environmental impact report, the State suggests, "they could have simply chosen to *say something else.*" (Newsom Br. 52.)

The State's argument is cursory, so it is hard to know what it means. The only authority it cites, indirectly by way of a "see" signal, is section 21081(b) of the Public Resources Code. But that subsection is what compels a statement of overriding considerations at the heart of this appeal. It states that, when the agency finds that the environmental harms cannot be mitigated, the project cannot go forward unless the agency makes the statement of overriding considerations that "outweigh" the environmental harms.

The word "outweigh" distinctly connotes a discretionary power. And if the decision is vested in a speaker to make a pronouncement, or not, on a project's superior "economic, legal, social, technological, or other benefits," then mandating that pronouncement is compelled speech. And that is, obviously, the opposite of discretionary. So it is hard to understand how the State believes a discretionary act may be converted into a ministerial one.

Rather, the statement must be genuine, and not a sham. *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.*, 91 Cal. App. 4th 1344, 1355 (2001) (the EIR process requires a "good-faith effort" to disclose the environmental impacts of a project to the public); *Save Our Neighborhood Grp. v. City of Lancaster*, No. B225087, 2011 Cal. App. Unpub. LEXIS 4612, at *17 (2011) (CEQA's public disclosure requirements include "a reasonable, good faith effort to disclose and evaluate environmental impacts and to identify and describe mitigation measures and alternatives; and whether the final EIR includes reasonable responses to comments on the draft EIR raising significant environmental issues"). The State's suggestion that Plaintiffs need not make a complete, truthful, and good faith statement is not well taken.

A couple pages later, the State again cites section 21081(b) for the same proposition, but now adds two case citations, *Tiburon Open Space Comm. v. Cnty. of Marin*,

78 Cal. App. 5th 700, 733 (2022); *Sequoyah Hills Homeowners Ass'n v. City of Oakland*, 23 Cal. App. 4th 704, 715 (1993). (Newsom Br. 53.) Neither case supports the State.

*Tiburon* does not suggest that the requirements of section 21081(b) may be excused. To the contrary, it confirms that § 21081(b) applies when an agency "deems a project sufficiently important or desirable," including "allow[ing] for considerations, conditions, or factors that are 'legal.'" *Tiburon*, 78 Cal. App. 5th at 733. The "legal" factor the *Tiburon* court was referring to here was the fact that the agency, embroiled in decades of litigation over housing development, stipulated to a judgment that required it to issue development permits, which the agency did. The plaintiffs challenged that action, contending that, by stipulating to issue the statement of overriding considerations in the face of litigation, the agency improperly delegated its discretionary authority to the developers. The court rejected this, reasoning that the agency's legal obligation under the stipulated judgment was an appropriate "legal" factor supporting the statement of overriding considerations. *Tiburon* does not aid the State. To the contrary, it confirms that an agency's statement of overriding considerations is an act of discretion—not a ministerial act.

The State fares no better with *Sequoyah Hills*, 23 Cal. App. 4th at 715, which merely observes that an agency is "permit[ted]" to approve environmentally harmful projects if it finds that mitigating those harms would be "infeasible," such as complicated by "legal" factors. But that is not the question here. Instead, the issue is whether the City may be *compelled* to approve the environmentally harmful housing element.

### C. Penalizing Plaintiffs for failing to engage in speech is compelled speech.

The State argues that there is no restriction on speech, merely a penalty for not enacting the housing element. (Newsom Br. 52.) But the State may not violate constitutional rights indirectly by the artifice of punishing individuals for standing on their rights. It is well-established "that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted); *accord Dunn v. Blumstein*, 405 U.S. 330, 340-41 (1972). "Constitutional rights would be of little value if they could be . . . indirectly denied, or manipulated out of existence." *Harman*, 380 U.S. at 540 (internal quotation marks and citations omitted).

As the Supreme Court has warned in another context, the Constitution protects against "sophisticated as well as

simple-minded" violations. *Gomillion v. Lightfoot*, 364 U.S. 339, 342 (1960).

### D.    Subjecting Plaintiffs to litigation for failing to engage in speech is compelled speech.

As it did in opposition to Plaintiffs' motion to enjoin the state-court proceedings, the State argues that, if the state court orders the City to conform its housing policies to state law (Cal. Gov. Code § 65754(a)), the City "will not need to adopt a statement of overriding considerations. *See* Cal. Gov. Code § 65759(a) (exempting from CEQA any action necessary for a local jurisdiction to bring its land use policies into conformity with state law pursuant to a court order)." (Newsom Br. 53.)

The State's argument on this point is cursory, filing not quite eight lines of text, and supported only indirectly by a single citation. The State cites no authority supporting his interpretation of section 65759, and appropriately deploys the "see" signal when citing to the statute.

But even if the State is correct, by suing Plaintiffs it is punishing them for failing to engage in compelled speech. And even if section 65759 allows an end-run around CEQA as the State suggests, a Statement of Overriding Considerations would be excused only upon entry of a "court order or judgment under this article." But no such order or judgment exists. So the City is not now, and never has been,

35

excused from the requirements of CEQA. So whatever the future may hold for the State's argument, the fact remains that Plaintiffs, for refusing to engage in compelled speech, have been sued because they "refused to adopt a housing element in violation of state law." Cal. Gov. Code § 65585(j); 2-ER-159; 3-ER-530. By making it unlawful for Plaintiffs to refuse to make a particular statement, the State compels speech.

## VII.  While reversal does not require revisiting *South Lake Tahoe*, its holding is not as broad as Defendants argue.

SCAG argues that *South Lake Tahoe*'s holding "was based on well-settled Ninth Circuit authority. (SCAG Br. 12.) SCAG's argument is puzzling. Plaintiffs have not argued that reversal requires revisiting *South Lake Tahoe*. As the State acknowledges, "Notably, Appellants' brief does not ask this Court to revisit *South Lake Tahoe*." (Newsom Br. 32.)

But SCAG is wrong. None of the cases SCAG cites actually supports a categorical per se standing bar. As early as 1981—just one year after *South Lake Tahoe*—another panel of this Court stated, "[w]hile there are broad dicta that a political subdivision may never sue its maker on constitutional grounds [citing *South Lake Tahoe*], we doubt that the rule is so broad." *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1309, n. 7 (9th Cir. 1981).

SCAG cites *Palomar Pomerado*, 180 F.3d at 1108, holding that a health authority lacked standing to challenge State of California and its employees on federal constitutional grounds. But as Judge Hawkins said of *South Lake Tahoe* urging the Court to revisit it, "[w]e have thus never satisfactorily stated our rationale for including all constitutional challenges within the ban." *Palomar Pomerado*, 180 F.3d at 1109 (Hawkins, J., concurring). The *South Lake Tahoe* holding, said Judge Hawkins, quoting *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), was based on "'the seemingly unconfined dicta of *Hunter* . . . .'" Which is why, when the Supreme Court denied certiorari in *South Lake Tahoe*, "Justice White dissented on the grounds that a per se rule was inconsistent with *Board of Education v. Allen*, 392 U.S. 236 (1968) . . . ." *Palomar Pomerado*, 180 F.3d at 1110 (Hawkins, J., concurring). Even framing the issue as one of standing was incorrect, as Judge Hawkins observed, quoting *Rogers*, 588 F.2d at 1069: "Although the cases spoke in terms of standing, they are more accurately described as 'substantive holdings that the Constitution does not interfere in states' internal political organization.'" *Palomar Pomerado*, 180 F.3d at 1109 (Hawkins, J., concurring). And interfere in the state's internal political organization is precisely what the State asks this Court to do when it urges that "the California state constitution is irrelevant." (Newsom Br. 28-29.)

SCAG also cites *Thomas v. Mundell*, 572 F.3d 756, 761 (9th Cir. 2009), but that case only concerned individual standing, not the standing of a "political subdivision."

SCAG next cites, surprisingly, *San Juan Capistrano*, 937 F.3d at 1281—surprising because the panel there explained that the standing bar was based on the principle that, "as 'creature[s]'" of the state, general-law cities may not sue states "as their 'creators.'" *Id.* at 1280. Because Charter Cities are not created by the state, *San Juan Capistrano* confirms that *South Lake Tahoe* does not apply. And Judge Nelson penned a concurrence, again calling to revisit *South Lake Tahoe* in light of intervening Supreme Court standing jurisprudence in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), a circuit split, and at least three prior calls within the Circuit for en banc review. *San Juan Capistrano*, 937 F.3d at 1282-84 (Nelson, J., concurring). Judge Nelson concluded by urging the "current per se standing rule, while providing the benefit of a clear bright line, does not permit full consideration of important constitutional questions in future cases." *Id.* at 1284.

Again, reversal here is consistent with *South Lake Tahoe* because that holding does not apply to a Charter City. But that holding, aged over four decades, shows signs of strain. The Court may revisit whether that precedent remains structurally sound, but pending such inspection it may be unwise to make it bear more weight.

## VIII. CONCLUSION

The no-standing rule of *South Lake Tahoe* was based on the principle that federal courts will not interfere in disputes concerning states' internal political organization. Making federal courts the expositor of states' internal organization is contrary to that intent. The State would advance the no-standing rule by defeating the no-interference principle.

The Court should reverse the dismissal so this case may proceed to the merits.

Respectfully submitted,

April 24, 2024                    MICHAEL E. GATES, CITY ATTORNEY

By: _/s/ Michael E. Gates_

Michael E. Gates
Nadin S. Said
*Attorneys for Plaintiffs and Appellants City of Huntington Beach, Huntington Beach City Council, Mayor of Huntington Beach, Tony Strickland, and Mayor Pro Tem of Huntington Beach, Gracey Van Der Mark*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Plaintiffs and Appellants City of Huntington Beach, *Huntington Beach City Council, Mayor of Huntington Beach, Tony Strickland, and Mayor Pro Tem of Huntington Beach, Gracey Van Der Mark*, certifies that this brief contains 7,014 words, as counted by Microsoft Word, excluding the items exempted by Federal Rules of Appellate Procedure 32(f). The brief's type size and typeface comply with Federal Rules of Appellate Procedure 32(a)(5) and (6). Counsel certifies that this brief complies with the longer length limit permitted by Cir. R. 32-2(b) because Plaintiffs are filing a single brief in response to multiple briefs.

April 24, 2024　　　　　MICHAEL E. GATES, CITY ATTORNEY

By: __*/s/ Michael E. Gates*__

Michael E. Gates
Nadin S. Said

*Attorneys for Plaintiffs and Appellants City of Huntington Beach, Huntington Beach City Council, Mayor of Huntington Beach, Tony Strickland, and Mayor Pro Tem of Huntington Beach, Gracey Van Der Mark*

## CERTIFICATE OF SERVICE

*City of Huntington Beach v. Newsom*

Case No. 23-3694
Dist. Ct. No. 8:23-cv-00421

I certify that on April 24, 2024, a copy of the document above, titled Appellants' Reply Brief, filed in the court referenced above, was served by Notice of Electronic Filing automatically generated by that Court's electronic filing and service facilities.

*/s/ Michael E. Gates*

Michael E. Gates